TSR, INC. AND SUBSIDIARY, F.K.A. TSR HOBBIES, INC.,
PETITIONER *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 29155-87.          Filed June 25, 1991.

*C. Lee Cook, Jr.,* and *Paul E. Hoelschen, Jr.,* for the petitioner.

*William E. Bogner* and *William Derick,* for the respondent.

RUWE, *Judge:* In his notice of deficiency, respondent determined the following deficiencies in petitioner's Federal corporate income tax:

| TYE | Deficiency |
| --- | --- |
| Sept. 30, 1977 | $12,249 |
| Sept. 30, 1978 | 5,905 |
| Sept. 30, 1979 | 291 |
| Sept. 30, 1980 | 89,711 |
| June 30, 1981 | 681,471 |
| June 30, 1982 | 481,176 |

The deficiencies at issue for petitioner's taxable years ending September 30, 1977, 1978, and 1979, result from respondent's disallowance of tentatively allowed refunds caused by carrybacks of unused tax credits from petitioner's fiscal year ending September 30, 1980. The deficiency at issue for petitioner's taxable year ending September 30, 1980, results from respondent's disallowance of a portion of a tentatively allowed refund caused by a net operating loss carryback from petitioner's taxable year ending June 30, 1983. The deficiency at issue for petitioner's taxable year ending June 30, 1981, results from respondent's disallowance of a portion of a tentatively allowed refund caused by a net operating loss carryback and a carryback of unused research credit from petitioner's taxable year ending June 30, 1983. The deficiency at issue for petitioner's taxable

year ending June 30, 1982, results in part from respondent's disallowance of a research credit claimed on petitioner's corporate income tax return for its taxable year ending June 30, 1982, in part from respondent's disallowance of a tentatively allowed refund caused by a carryback of unused research credit from petitioner's fiscal year ending June 30, 1983, and in part from respondent's disallowance of a portion of a tentatively allowed refund caused by a net operating carryback and a carryback of unused research credit from petitioner's taxable year ending June 30, 1984.

Following a concession by respondent, the only issue for decision is whether expenditures incurred by petitioner for creating, developing, and writing games, game-related products, and game-related books and magazines constitute "qualified research expenses" for purposes of the credit for increasing research activities under section 44F.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner is a corporation organized and existing under the laws of the State of Wisconsin. At the time of filing its petition, petitioner's principal place of business was located in Lake Geneva, Wisconsin.

Petitioner filed Federal corporate income tax returns (Form 1120) for the taxable years ending June 30, 1982, 1983, and 1984, with the Internal Revenue Service Center at Kansas City, Missouri. Petitioner subsequently filed amended Federal corporate income tax returns (Form 1120X) for the taxable years ending June 30, 1982, 1983, and 1984, with the Internal Revenue Service Center at Kansas City, Missouri. Petitioner also filed applications for tentative refund (Form 1139) with respect to its taxable

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Sec. 44F was redesignated sec. 30 of the Internal Revenue Code by sec. 471(c) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 826, 831. Sec. 30, in turn, was amended and redesignated as sec. 41 of the Internal Revenue Code by sec. 231(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2173-2180. For purposes of this opinion, the designation "sec. 44F" will be used to refer to sec. 44F and its subsequent redesignations.

years ending September 30, 1980, June 30, 1983, and June 30, 1984.

Petitioner is most noted for the development and sale of the fantasy role-playing game "Dungeons & Dragons." "Dungeons & Dragons" involves role-playing adventures in which the players of the game imagine that they are characters involved in various adventures that occur in a medieval, mythological setting. "Dungeons & Dragons" was developed in the early 1970s. Petitioner also sells books, games, and accessories that are related to "Dungeons & Dragons."

Petitioner has also developed and sells other role-playing adventures under the themes of: (1) Spies, soldiers, and super heroes; (2) future science; and (3) legends, lore, and myth.

A role-playing game is usually played without a board or map, with most of the playing being a verbal exchange between players and a narrator or moderator who uses a programmed adventure with hidden map and an explanatory keyed text made for the narrator's eyes only. Each game is unique and has a specific player objective or purpose. Players do not play against the narrator.

During the period at issue, petitioner developed and sold other products including historical simulation and strategy games, game books, toys and white metal miniatures,[2] calendars, comic annuals, various gifts and collectibles, and periodicals including Dragon Magazine and Amazing Stories Magazine.

Many of the games sold by petitioner are of the adventure gaming variety. Adventure gaming falls into three categories: (1) Traditional board games; (2) fantasy role-playing games; and (3) historical simulation strategy games.

The products developed by petitioner during the years in issue were developed primarily by petitioner's new products development division. Petitioner developed and introduced approximately 125 new products each year during the years at issue. Employees of the various departments within the new products development division worked individually on specific topics within their area of responsibility. These

---

[2] White metal miniatures are small models of the characters and other items involved in role-playing fantasy games. They are sold in rough form, and the purchasers sand and paint them.

employees also worked together on the general concepts of the game in order to integrate their individual efforts into a working game. Eventually, a prototype product was developed. If the product was a new game or game module,[3] the new products development division also play tested (e.g., played the game or game module to determine if it would be popular with petitioner's consumers) the product. The games and game modules produced by petitioner consisted primarily of written materials.

The principal market segment for many of petitioner's products consists of males between the ages of 12 and 20 and, more specifically, in the age group 14 to 16 years old. These consumers of petitioner's products are usually of above average intelligence, live in urban or suburban areas, and are from families in the middle and upper-middle income levels. In addition, certain of petitioner's products—such as the historical and military simulation and strategy games—appeal to players of older ages.

Petitioner's new products development division was responsible for supplying the company with an adequate supply of new products. The new products development division was divided into five functions: 3-D products, game-related publishing, editorial services, graphic arts services, and product design and packaging.

The 3-D products function was responsible for the product design and development of the line of white metal miniatures, other toy-related lines, and miscellaneous hobby and craft lines. In addition, this department was responsible for the casting or mold-making for the white metal miniatures, paper engineering, and sculpture related products, and acted as a liaison for TSR Far East, apparently a foreign subsidiary of petitioner.

The game-related publishing function was responsible for the design and development of games and game-related products. It was made up of game designers and their editors. Its activities consisted primarily of researching a new product idea suggested by petitioner's marketing department and developing this idea into a new game or

---

[3]A game module is a variation of an already existing game. In the context of the role-playing games, a game module permits the player to play new adventures which were not part of the original game.

game module. As part of the development process of new games and game modules, members of this department researched the topic upon which the game or game module was based, translated this research into the working mechanics of the game, and then played the prototype of the game and adjusted the principles upon which the game is based. These adjustments were made in order to enhance the play.

The editorial services function was responsible for writing, editing, and developing books, book-related products, and other written materials published by petitioner. This department also translated petitioner's products into foreign languages and acquired transcripts from free-lance writers.

The graphic arts services function was responsible for the visual development of products and promotional material. Employees of this department developed artwork which was available to petitioner's consumers and which helped the consumers visualize the action that was taking place in games. Employees of this department were also responsible for typesetting of products and promotional material, keylining of products and promotional material, proofreading, development of prototypes, and camera work for printing preparation.

The product design and packaging function developed the packaging and promotional materials for the product lines. Employees of this department also developed product layouts and formats and computerized production scheduling and monitoring.

Many of the adventure gaming games and game-related accessories require the participants to imagine themselves in a particular setting. For instance, the "Dungeons & Dragons" players imagine that they are characters on an adventure in a medieval setting. Similarly, the players of petitioner's "Gang Busters" game imagine themselves as characters in a 1920s prohibition, "cops and robbers" setting, and the players of petitioner's "Boot Hill" game imagine themselves as characters in the American West during the 1800s.

One objective of the new products development division was to produce a game that was accurate in technical detail and historical facts. This was important because the people

who played petitioner's games became immersed in the various aspects of the subject matter and setting of the game. If the game was based on inaccurate information, word would spread among the people who played the game that the game was not realistic, and the game's sales would suffer. Consequently, the game-related publishing function thoroughly researched the historical and technical information upon which the game was based.

In conducting its research, the game-related publishing function employees consulted their own personal libraries, petitioner's library, government documents, museums, and other sources in their effort to collect information relevant to the game. This information was incorporated into the mechanics of the game. The result was an adventure game which was based on accurate information. For example, the players of "Dungeons & Dragons" who imagined that they were on an adventure in a medieval European setting availed themselves of items from the medieval European time period. The game designers identified these items and made them available (in an imaginary sense) to the game players. They also determined the consequences of acquiring and possessing a particular item. For instance, a "Dungeons & Dragons" player might acquire a long bow. Petitioner's employees determined how hard it was to obtain a long bow in medieval Europe, how much a long bow would cost, and how effective a long bow was as a weapon. The employees incorporated this information into the game mechanics by mathematical formulas. The mathematical formulas helped to determine the relative strengths and weaknesses conferred on a player by the acquisition of the item so that these strengths and weaknesses could be measured relative to other items acquired by other players. Consequently, the player acquiring the long bow enjoyed the benefits as well as endured the burdens of the acquisition. Petitioner conducted similar research with respect to petitioner's other games and game modules.

For historical simulation games, such as the "World War II" game developed during the years at issue, the game designers researched various military weaponry, specifications for air and naval craft, examined such aspects as speed, fire power, personnel capacity, and range of the items

studied. This type of research involved the use of governmental reports and other publications, various textbooks, published research materials, product catalogues of weapon manufacturers, and maps. This research also included visits to libraries, museums, and other relevant sites, such as a civil war battlefield.

Once the data for the game was collected and the basic game format was established, petitioner's employees "play tested" the new game. This involved playing the game and making adjustments to enhance its entertainment value. For instance, if information that was incorporated into a game gave one character such an advantage that that character consistently prevailed over other characters, the weight attached to this information was diminished so that the players would be balanced and the outcome of the game would be determined by the individual player's skill and decision making.

In addition to the games and game modules developed by petitioner during the years in issue, petitioner also developed other types of game-related products. These products included toy models of various characters involved in the games, paints and glues for the models, special dice for the games, educational adaptations of petitioner's games, computer versions of petitioner's games, and solo games that an individual could play.

Petitioner obtained copyrights on virtually all of its products including books, magazines, games, game modules, magic-viewer modules, minigames, game accessories, and needlecraft designs. The game accessories for which copyrights were obtained included game screens, monster cards, 3-D dragon tiles, character reference sheets, bendable toys, character miniatures, blister packs, and metal miniatures.

The costs claimed by petitioner as research expenses include the cost of taking a product from its idea or concept to the creation of a final prototype. The costs of manufacturing the product for commercial distribution are not included as costs of new product development.

The following schedule summarizes the expenses claimed by petitioner as the basis of the research credit.

TSR, INC.
Research Credit Summary

| Department No. 1984 | 1982-83 | Department | 6/81 | 6/82 | 6/83 | 6/84 |
|---|---|---|---|---|---|---|
| 320 | 320 | Product management | --- | --- | 60,579 | 36,447 |
| --- | 345 | Ex. vice pres. games | --- | --- | 58,778 | --- |
| 330 | 330 | Ex. vice pres. res. acq. | --- | --- | 37,334 | 47,313 |
| 323 | 340 | Game designers— graphics | 208,414 | 265,257 | 243,389 | 152,174 |
| --- | 321 | Computer games | 12,593 | 33,965 | 44,281 | --- |
| 322 | 322 | Editing | --- | 67,570 | 187,604 | 120,788 |
| --- | 303 | Education | 24,418 | 45,306 | 110,002 | --- |
| 421 | 542 | Product design | 76,106 | 65,380 | 51,486 | 374,988 |
| 603 | 600 | Vice pres. dragon mag. | 29,465 | 135,679 | 18,146 | 27,870 |
| 325 | 310 | Vice pres. toy-hobby gift | --- | --- | 52,527 | 210,328 |
| --- | 311 | R&D | --- | --- | 56,491 | --- |
| --- | 312 | Design | --- | --- | 9,356 | --- |
| --- | 313 | Development | --- | --- | 21,156 | --- |
| --- | 707 | Greenfield needle work; GNW | --- | --- | 15,408 | --- |
| --- | 710 | Design | --- | --- | 22,940 | --- |
| --- | 713 | President | --- | --- | 21,032 | --- |
| --- | 423 | Pre-press | 6,356 | 55,430 | --- | --- |
| | | Salaries: Owners & vice president | 13,479 | 148,074 | 162,881 | 179,171 |
| | | Total wages | 370,831 | 816,661 | 1,173,390 | 1,149,079 |
| | | Depreciation | --- | --- | --- | 41,685 |
| | | Supplies | 27,532 | 26,961 | 47,264 | 39,753 |
| | | Office expenses | 15,957 | 13,244 | --- | --- |
| | | Outside contracts: 65% | 7,776 | 20,469 | 73,900 | 160,059 |
| | | Equipment leases—computers | --- | 35,275 | 169,928 | 61,649 |
| | | Manuscript expense: 65% | --- | 59,796 | --- | --- |
| | | Misc. expenses | 2 | 17 | 4,870 | --- |
| | | Total research expense | 422,098 | 972,423 | 1,469,352 | 1,452,225 |

Petitioner reflected total research expenses of $972,423, $1,469,371, and $1,446,225 on its income tax returns for its taxable years ended June 30, 1982, 1983, and 1984, respectively.[4]

Based on the total research expenses stated above, petitioner claimed research credits in the amounts of $121,553, $183,671, and $149,907 for its taxable years ended June 30, 1982, 1983, and 1984, respectively. These amounts total $455,131.

---

[4]We note that there is a small variance between the amounts reflected on the corporate income tax returns for the taxable years ending June 30, 1983, and June 30, 1984, and the amounts reflected in petitioner's schedule of research-related expenses.

Respondent disallowed all of the above-stated amounts of research credit in the notice of deficiency issued to petitioner on May 29, 1987.

## OPINION

The amounts for which petitioner claimed a credit under section 44F were spent for new product development. Respondent contends, however, that the type of new product development activity conducted by petitioner is not the type of research which qualifies for the section 44F credit. Therefore, we must determine whether the expenses incurred by petitioner's new products development division in connection with the development of new products constitute "qualified research expenses" as described in section 44F.

Section 44F provides a credit against the tax imposed in an amount equal to 25 percent of the excess (if any) of: (1) The qualified research expenses for the taxable year, over (2) the base period research expenses. Sec. 44F(a). Qualified research expenses are defined as the sum of: (1) In-house research expenses; and (2) contract research expenses which are paid or incurred by the taxpayer during the taxable year. Sec. 44F(b). Base period research expenses are defined as the average of the qualified research expenses incurred or paid by the taxpayer in the 3 years immediately preceding the year in which the credit is being taken. Sec. 44F(c). For tax years ending after June 30, 1981, and before June 30, 1982, base period research expenses equal qualified research expenses incurred in the year immediately preceding the year in which the section 44F credit is claimed. For tax years ending after June 30, 1982, and before June 30, 1983, base period research expenses equal the average of qualified research expenses incurred in the 2 years immediately preceding the year in which the section 44F credit is claimed. Sec. 44F(c)(2)(B).

Petitioner contends that all of its alleged qualified research expenses are attributable to in-house research expenses. In-house research expenses are defined as: (1) Any wages paid or incurred to an employee for qualified services performed by such employee; (2) any amount paid or incurred for supplies used in the conduct of qualified

research; and (3) any amount paid or incurred to another person for the right to use personal property in the conduct of qualified research. Sec. 44F(b)(2)(A). Qualified services are defined as services consisting of engaging in qualified research, or engaging in the direct supervision or direct support of research activities which constitute qualified research. Sec. 44F(b)(2)(B).

In order to determine whether the expenses incurred by petitioner constitute qualified research expenses within the meaning of section 44F, we examine the plain and ordinary meaning of key phrases used in the statute and relevant regulations, the legislative history of section 44F, and the 1986 amendment to the definition of "qualified research." This examination indicates that Congress intended for the section 44F credit to apply to expenditures for research in the areas of natural, physical, or applied sciences or research which is technological in nature, and that Congress did not intend for the credit to apply to other types of research.

## A. *Plain and Ordinary Meaning*

For the years in issue, section 44F(d) defined "qualified research" in the following manner:

SEC. 44F(d). QUALIFIED RESEARCH.—For purposes of this section the term "qualified research" has the same meaning as the term research or experimental has under section 174, except that such term shall not include—

(1) qualified research conducted outside the United States,

(2) qualified research in the social sciences or humanities, and

(3) qualified research to the extent funded by any grant, contract, or otherwise by another person (or any governmental entity).

Neither section 174 nor its legislative history provides a definition for the phrase "research or experimental." The Treasury Department promulgated regulations defining this phrase in 1957. T.D. 6255, 1957-2 C.B. 180, 183. Congress subsequently indicated approval of this definition when it enacted section 44F. See Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172; S. Rept. 97-144 (1981), 1981-2 C.B. 412; H. Rept. 97-201 (1981), 1981-2 C.B. 352.

Research or experimental expenditures for purposes of section 174 are defined as "research and development costs

in the experimental or laboratory sense." Sec. 1.174-2(a), Income Tax Regs. For purposes of section 174, research or experimental expenditures do not include expenses incurred in connection with "literary, historical, or similar projects." Sec. 1.174-2(a), Income Tax Regs.

The regulations do not define the terms "experimental," "laboratory," "literary," or "historical." Accordingly, it is appropriate to look at the plain and ordinary meaning of these terms in order to determine their meaning. See *Commissioner v. Brown,* 380 U.S. 563, 571 (1965).

The plain and ordinary meanings of "experimental" and "laboratory" support our interpretation that Congress intended to limit the section 44F credit to technological or scientific research. "Experimental" is defined as "relating to, or based on experience." Webster's Third New International Dictionary 800 (1986). "Laboratory" is defined as "a place devoted to experimental study in any branch of natural science or to the application of scientific principles in testing and analysis." Webster's Third New International Dictionary, *supra* at 1260. Taken together, the term "experimental or laboratory," as used in the context of section 1.174-2(a), Income Tax Regs., means scientific research and analysis. By contrast, "literary" is defined as "relating to, or having the characteristics of humane learning." Webster's Third New International Dictionary, *supra* at 1321. "Historical" is defined as "relating to, or having the character of history." Webster's Third New International Dictionary, *supra* at 1073. "History" is defined as "a branch of knowledge that records and explains past events as steps in the sequence of human activities." Webster's Third New International Dictionary, *supra* at 1074. Thus, within the context of section 1.174-2(a), Income Tax Regs., the phrase "literary, historical, or similar projects" refers to projects in the areas of human interest and human values as opposed to experimental or laboratory research which is scientific or technological.

Because of the three specific exceptions contained in section 44F(d), the term "qualified research," as used in section 44F, is more limited than "research and experimental," as used in section 174. Section 44F(d), provides that "qualified research" does not include in its definition: (1)

Qualified research conducted outside the United States; (2) qualified research in the social sciences or humanities; and (3) qualified research to the extent funded by any grant, contract, or otherwise by another person (or any Government entity). Sec. 44F(d). Respondent does not argue that the expenses incurred by petitioner were for research conducted outside the United States or that the research was funded by anyone other than petitioner. Thus, for purposes of the instant case, petitioner must demonstrate that the expenses upon which the section 44F credit is based are (1) research and experimental expenditures under section 174, and (2) are not expenses incurred in research in the social sciences or humanities. Sec. 44F; Rule 142(a).

Section 44F does define the terms "humanities" or "social sciences." The plain and ordinary meanings of the terms "humanities" and "social sciences," however, also indicate that Congress intended to limit the section 44F credit to scientific or technological research involving the physical sciences. "Humanities" is defined as "the branches of learning regarded as having primarily a cultural character and usually including languages, literature, history, mathematics, and philosophy." Webster's Third New International Dictionary, *supra* at 1101. "Social science" is defined as "the branches of science that deal with the institutions and functioning of human society and with the interpersonal relationships of individuals as members of society." Webster's Third New International Dictionary, *supra* at 2162. By specifically excluding research in these areas from eligibility for the credit, Congress indicated that it intended the section 44F credit to only apply to research involving the technical and analytical areas of natural and physical sciences.[5] Hereafter, when we refer to "scientific" or "technology," we are using these terms in that sense.

---

[5]Our use of the term "natural sciences" refers to the "branches of science (as physics, chemistry, biology) that deal with matter, energy, and their interrelations and transformations or with objectively measurable phenomena." Webster's Third New International Dictionary 1507 (1986). Our use of the term "physical sciences" refers to "the natural sciences (as mineralogy, astronomy, meteorology, geology) that deal primarily with nonliving materials." Webster's Third New International Dictionary, *supra* at 1707.

## B. *The 1981 Legislative History of Section 44F*

The legislative history regarding the exclusion of expenditures for research in the social sciences and humanities from the section 44F credit indicates that Congress intended the credit to apply only to technological or scientific research. In explaining this exclusion, the House report states that "the credit is not available for any activity in the social sciences or humanities (including the arts) * * * . * * * to be eligible for the credit, the research *must* be performed in a field of laboratory science (such as physics or biochemistry), engineering, or technology." H. Rept. 97-201 (1981), 1981-2 C.B. 352, 360 (emphasis added). This indicates that the exclusion was intended to limit the credit to scientific or technological research.[6]

The Senate Finance Committee report and the transcripts of the 1981 hearings held on section 44F are consistent with a finding that Congress intended the credit to apply to scientific and technological research. S. Rept. 97-144 (1981), 1981-2 C.B. 412, 438-439; Hearings on S. 98 before the Senate Comm. on Finance, 97th Cong., 1st Sess. 2-108, 393-401 (1981); Hearings on H.R. 1539 before the House Ways and Means Comm., 97th Cong., 1st Sess. 2021-2077 (1981).[7] The House and Senate hearings prior to the adoption of section 44F indicate that Congress wanted to encourage investment in high-tech research and development. Only representatives from high-tech industries[8] or representatives from universities which also had an interest in increased scientific and technological research testified at the hearings. Hearings on S. 98, *supra;* Hearings on H.R.

---

[6]We note that the House Ways and Means Committee's proposed statutory definition of "qualified research" was not adopted. Instead, the definition proposed by the Senate Finance Committee (i.e., that qualified research has the same meaning as research and experimental has under sec. 174) was adopted. Accordingly, we have placed no reliance on the House Ways and Means Committee's definition of "qualified research." See Black, "The Research Credit: R&D in the Post-ERTA Period," 41st Annual N.Y.U. Tax Inst. 12-1, 12-6 through 12-8 (1983). Nonetheless, the specific statutory exclusion from the sec. 44F credit for research in the social sciences and humanities was part of the House bill which was adopted. Thus, reliance on the above-quoted portion of the House report is appropriate.

[7]Statements at committee hearings have been considered as aids in determining legislative intent. 2A Sands, Sutherland Statutory Construction, sec. 48.10, p. 318 (4th ed. 1984). For example, see *Regan v. Wald,* 468 U.S. 222, 238 (1984).

[8]Witnesses on behalf of the American Electronics Association, the Semiconductor Industry Association, the Scientific Apparatus Makers Association, Sperry Corp., the Electronic Industries Association, the Computer & Business Equipment Manufacturer's Association, and the Alliance for American Innovation testified before the committees.

1539, *supra.* These hearings focused on the benefits that the section 44F credit would confer on technologically intensive industries. The testimony highlighted the need to stimulate research and development in the high-tech industries in order to stimulate growth in these industries. Moreover, the witnesses testified that the technological innovations made by high-tech industries in turn benefited the economy in general. Finally, the members of the high-tech industries testified that a tax credit would enhance their ability to compete with foreign competitors.

The Senate and House reports indicate that one reason Congress adopted the section 44F credit was its concern that the decline in investment in research and development had adversely affected this country's economic growth, productivity gains, and ability to compete in world-wide markets. S. Rept. 97-144, *supra,* 1981-2 C.B. at 439; H. Rept. 97-201, *supra,* 1981-2 C.B. at 358. Congress' concern with economic growth, productivity gains, and the ability to compete in world markets suggests that Congress intended for the credit to apply to the type of research that would result in a new industrial product, process, or machine, the development of which would enhance these aspects of our country's economy. We recognize that petitioner's research was in connection with the development of a new product and, to that extent, it increased economic growth. However, the same can be said for research in connection with the development of other products which clearly do not qualify for the section 44F credit. For instance, an author may conduct research on a novel. This is research in connection with a literary project and, therefore, is not creditable. This is true despite the fact that the research results in a new product which increases economic growth. In short, just because the research is in connection with the development of a new product does not necessarily mean that the research qualifies for the credit.

As previously discussed, the 1981 House report indicated that qualified research was restricted to that conducted in "laboratory science (such as physics or biochemistry), engineering, or technology." H. Rept. 97-201, *supra,* 1981-2 C.B. at 360. Petitioner argues that the language in the 1981 House Ways and Means Committee report should be interpreted broadly. Specifically, petitioner argues that a

broad interpretation of the word "technology" is necessary in order to further Congress' stated objective of stimulating investment in research and development. This interpretation is inconsistent with the fact that Congress chose to limit the credit to only certain types of research. The limited scope of the section 44F credit indicates that Congress did not intend to stimulate investment in all types of research. In light of the limitations placed on the availability of the credit, it is hard to imagine that Congress intended for the credit to be applied as broadly as petitioner argues.

"Technology" is commonly defined as "the application of scientific knowledge to practical purposes in a particular field." Webster's Third New International Dictionary, *supra* at 2348. This commonly understood meaning of technology is also illustrated by a subsequent amendment to the research credit provision of the Code. In 1986, Congress amended the definition of "qualified research" to specifically restrict it to research that is "technological in nature." Tax Reform Act of 1986, Pub. L. 99-514, sec. 231, 100 Stat. 2085, 2173-2180. Congress did not statutorily define "technological" in the 1986 amendment. However, the legislative history to the 1986 amendment indicates that Congress had an understanding of the term "technological" and believed the determination of whether research was "technological in nature"—

depends on whether the process of experimentation utilized in the research fundamentally relies on principles of the physical or biological sciences, engineering, or computer science—in which case the information is deemed technological in nature—or on other principles, such as those of economics—in which case the information is not to be treated as technological in nature. * * * [S. Rept. 99-313 (1985), 1986-3 C.B. (Vol. 3) 1, 696; see also H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 180.]

This meaning of "technological" is consistent with the common understanding of the word "technology" and further buttresses our finding that the section 44F credit is limited to research involving the natural and physical sciences.

The Treasury Department recently adopted final regulations on section 44F. T.D. 8251, 1989-1 C.B. 3. Under these regulations, the exclusion from the credit for research in the social sciences and humanities "encompasses all areas of

research other than research in a field of laboratory science (such as physics or biochemistry), engineering or technology." Sec. 1.41-5(c), Income Tax Regs. These regulations are consistent with the legislative history of section 44F. Specifically, these regulations apply the exclusion for research in the social sciences and humanities in the same manner prescribed by the previously referred to House report. H. Rept. 97-201, *supra*, 1981-2 C.B. at 360. Under these regulations, research that is not in the fields of laboratory science, engineering, or technology does not qualify for the credit.

## C. *The 1986 Amendment to the Definition of "Qualified Research" and Its Legislative History*

The Tax Reform Act of 1986 amended the definition of "qualified research" for purposes of the research credit and expressly provided that it be restricted to research that is "technological in nature." Tax Reform Act of 1986, Pub. L. 99-514, sec. 231, 100 Stat. 2085, 2173-2180. The legislative history of this amendment indicates that the reason for this amendment was that Congress believed that the Code should set forth an express definition of qualified research expenses for purposes of the credit because some taxpayers had interpreted the definition "too broadly."

The committee believes that the definition [of qualified research] *has been applied too broadly in practice,* and some taxpayers have claimed the credit for virtually any expenses relating to product development. According to early data on the credit, * * * many of these taxpayers do not engage in high technology activities. [S. Rept. 99-313, *supra,* 1986-3 C.B. (Vol. 3) at 694-695; see also H. Rept. 99-426, *supra,* 1986-3 C.B. (Vol. 2) at 178. Emphasis added.]

With respect to the new statutory language limiting the credit to expenditures for research that is "technological in nature," the legislative history explains that:

The determination of whether the research is undertaken for the purpose of discovering information that is technological in nature depends on whether the process of experimentation utilized in the research fundamentally relies on principles of the physical or biological sciences, engineering, or computer science—in which case the information is deemed technological in nature—or on other principles, such as those of economics—in which case the information is not to be treated as technological in

nature. \* \* \* [S. Rept. 99-313, *supra*, 1986-3 C.B. (Vol. 3) at 696; see also H. Rept. 99-426, *supra*, 1986-3 C.B. (Vol. 2) at 180.]

The amendment to the research credit provisions that was adopted in 1986 does not retroactively apply to the years before us. However, the legislative history of this amendment, coupled with the aforementioned legislative history surrounding the original enactment of section 44F, indicates that restricting the credit to research that is "technological in nature" was consistent with Congress' original intent when it adopted section 44F in 1981.[9]

Having determined that the section 44F credit only applies to research that is technological in nature, we now examine the type of research expenses which form the basis of the credit claimed by petitioner. The majority of petitioner's research involved games and game-related products. Petitioner incurred expenses in connection with research on topics which were ultimately integrated into these products. Petitioner also incurred expenses developing what is described as "game mechanics" wherein mathematical formulas were used and games were "play tested." The final product which embodied the game and related products consisted primarily of books, pamphlets, and other written materials.

Petitioner's research is not technological in nature and, therefore, does not qualify for the section 44F credit. The research conducted by petitioner did not require the application of any natural, physical, or laboratory sciences. The research conducted by petitioner was not directed at, and did not result in, any technological breakthrough. The research conducted by petitioner was more along the lines of library research where petitioner gathered preexisting information and incorporated this developed information into a game. Moreover, petitioner's development of "game mechanics" and "play testing" does not rise to the level of research in the laboratory sense. Petitioner did not "play

[9]"The view of a later Congress does not establish definitively the meaning of an earlier enactment, but it does have persuasive value." *Bell v. New Jersey*, 461 U.S. 773, 784 (1983). It could be argued that the 1986 amendment was necessary to close a loophole, thus indicating that the loophole must have existed. However, given the committee language indicating that Congress amended the definition of "qualified research" because that term had previously been "applied too broadly" and considering that the provisions in question were arguably susceptible of more than one meaning, we reject that interpretation. See *Home Group, Inc. v. Commissioner*, 875 F.2d 377, 381 (2d Cir. 1989).

test" the games to determine the validity of a scientific or technological hypothesis. Rather, petitioner play tested the games to determine their level of enjoyment.

Finally, we address petitioner's argument that, even if section 44F is restricted to scientific and technological research, it is still entitled to the section 44F credit for expenses incurred in connection with research on the glues, paints, and other aspects of the development of the white metal miniatures, dice, and other toys it produced. These expenses do not qualify for the section 44F credit. The record does not indicate that petitioner engaged in scientific or technological research in the development of these products. Petitioner's employees testified that they worked with several types of metals, paints, and glues in an effort to determine which materials best suited their needs. However, the testimony fails to establish that this research was scientific or technological in nature. The record indicates that petitioner's employees merely tested various materials that were already developed. Moreover, nothing in the record indicates the portion of the claimed credit attributable to money spent on the development of these products, if any. Therefore, even if we found that these expenses qualified for the section 44F credit, we still could not determine the amount of the credit.

*Decision will be entered under Rule 155.*