T.C. Memo. 2011-246

UNITED STATES TAX COURT

THE HERITAGE ORGANIZATION, LLC, GMK FAMILY HOLDINGS, LLC, TAX
MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12640-04, 13062-05.    Filed October 19, 2011.

<u>William A. Roberts</u> and <u>Peter M. Anastopulos</u>, for petitioner.

<u>Elaine H. Harris</u>, <u>Garrett D. Gregory</u>, and <u>Lauren LaRavia</u>,
for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  These cases are partnership-level proceedings
under the Tax Equity and Fiscal Responsibility Act of 1982
(TEFRA), Pub. L. 97-248, sec. 402, 96 Stat. 648, as amended.
Respondent issued a notice of final partnership administrative

adjustment (FPAA) on April 14, 2004, for the taxable year 2000

(tax year 2000) and issued an FPAA on April 15, 2005, for taxable

year 2001 (tax year 2001) to the Heritage Organization, LLC

(Heritage).  Respondent disallowed 11 payments of $550,000 each

(payoff amounts) that Heritage had claimed as research and

development expenses for tax year 2000.[1]  Respondent also

disallowed Heritage's protective claim that the payoff amounts

qualified as research and development expenses for tax year 2001.

GMK Family Holdings, LLC (Holdings), as tax matters partner,

timely filed petitions for readjustment of the partnership items

under section 6226(a)(1).[2]  The issues for determination are:

(1) Whether the payoff amounts are a tax year 2000 or a tax year

2001 partnership item, (2) whether the payoff amounts are

qualified research expenses under section 174, (3) whether the

payoff amounts to controlled corporations are ordinary and

necessary business expenses under section 162, (4) whether the

transaction should be recharacterized as a constructive

distribution to Gary Kornman (Kornman), and (5) whether an

---

[1]The tax year 2000 FPAA disallowed an additional $19,189 as
a nonresearch expense.  This issue has been settled between the
parties and is no longer in dispute.

[2]All section references are to the Internal Revenue Code
(Code) in effect for the years in issue and all Rule references
are to the Tax Court Rules of Practice and Procedure, unless
otherwise indicated.  These cases were consolidated for purposes
of trial, briefing, and opinion.

accuracy-related penalty for negligence under section 6662(a) applies.

FINDINGS OF FACT

Some facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, Heritage was a Delaware limited liability corporation with its principal place of business in Texas.

Heritage was formed in 1995 as an LLC and elected to be taxed as a partnership for Federal tax purposes. It had four members with the following ownership percentages: Holdings owned 5 percent, Steadfast Investments, L.P. (Steadfast), owned 87 percent, TIKCHIK Investment Partnership, L.P. (Tikchik), owned 3 percent, and The Koshland Family Partnership (Koshland), owned 5 percent. Holdings was wholly owned by Gary Morton Kornman (Kornman). Steadfast was owned by The Ettman Family Trust I, the 99-percent limited partner, and Kornman & Associates, Inc., the 1-percent general partner. Kornman was the sole owner of Kornman & Associates, Inc. Tikchik was owned 90 percent by a partnership controlled by an unrelated family and 10 percent by GMK Corp., an entity wholly owned by Kornman. Koshland is a partnership wholly owned by the Koshland family. In 1999 Tikchik purchased its LLC interest for $9 million and Koshland purchased its LLC interest for $15 million.

At the time the petition was filed, Kornman was the chief executive officer of Heritage. Kornman was an attorney who had worked in the life insurance industry since the early 1970s. William Ralph Canada (Canada) was the president and chief operating officer of Heritage. Canada had previously been outside legal counsel to Heritage's predecessor companies, but in 1995 he was hired by Heritage on a base salary with bonus commissions to market Heritage's life insurance and estate planning opportunities in addition to his officer duties. Vickie Walker (Walker) was the secretary-treasurer and chief financial executive officer of Heritage. Walker also had check-signing authority throughout the time at issue. Walker had worked for Kornman since the late 1970s, beginning soon after completing high school. For the tax years at issue she prepared both Heritage and most of Heritage's subsidiary's tax returns. She also performed accounting duties for the numerous entities owned and managed by Heritage, including classification of items for accounting purposes.[3]

Heritage was the last surviving entity of a long line of life companies (producer companies[4]) which represented multiple

---

[3]There is no evidence that appropriate cost sharing agreements existed between Heritage and the other entities it owned and managed.

[4]An "insurance producer" as used by the parties is a broker or agent that solicits or negotiates insurance contracts.

(continued...)

life insurance companies in States across the country. Initially, the company performed management and administration services for its life insurance clients and educated clients about other life insurance products. Beginning in the early 1990s Heritage became more involved with tax and estate planning for high-net-worth individuals with the financial ability to engage in more complicated transactions.

In the 1990s Heritage began to funnel more resources into different legal entities that undertook different elements of the business. The research entity was charged with using publicly available information to identify possible clients whose net worth exceeded $10 million and who might be interested in Heritage's planning techniques and insurance products. The research group created files on individuals using information it gathered from a large number of sources, including business journals, industry journals, public company reports, and Dun & Bradstreet reports.

Additionally, the research entity conducted legal and tax research regarding corporate and trust structures that would allow individuals to minimize income and estate tax. It spent hundreds of thousands of dollars for legal advice from estate and tax planning attorneys from around the United States.

_____

[4](...continued)
Typically, a State requires that an insurance producer be a company organized in that State, requiring Heritage to form producer companies in every State in which it wished to do business.

Heritage's subsidiary was responsible for contacting the targeted individuals and arranging for them to meet with Kornman. Heritage did not set up the structures or perform the transactions that it sold to clients. Instead, Kornman would present the idea to a client. The client would then vet the idea with his own legal counsel. If the client wanted to proceed, the client's counsel and Kornman would work together to complete the life insurance or estate planning transaction that Heritage had marketed.

Heritage was compensated in three ways. First, Heritage charged a "tire kicker" fee of $22,500 before presenting opportunities to potential clients. Heritage charged an additional $22,500 before agreeing to work further with clients, which it would do if the client agreed to use a Heritage producer life insurance entity if the client purchased life insurance. Second, if clients wished to proceed with a planning technique, they paid Heritage a commission based on the transaction type. Finally, clients paid a fee to Heritage equal to a percentage of the value of the assets used in the planning techniques.

The Transactions

In the late 1990s Kornman and Canada decided that Heritage should sell further future tax planning opportunities in addition to life-insurance-based ideas. First, to plan for a potential repeal of the exemption for the generation-skipping transfer tax

on estates, Heritage set up 60 trusts, anticipating that they would be grandfathered under the old laws. All the trust instruments were identical except for the names. Canada was the grantor of each trust and provided the initial funding which Heritage later reimbursed. The trust beneficiaries were Kornman's sons. Kornman served as the distribution trustee, administrative trustee, and family trustee.

Kornman, Canada, and an outside counsel subsequently developed a strategy to create trust basis through a contingent liability transaction and create built-in losses in the trusts. Heritage planned to sell these trusts to clients that could derive tax benefits from the built-in losses.

The strategy was to use a partnership contribution of an open short sale position; that is, the short sale proceeds subject to the obligation to replace the securities at closing. A client would open a brokerage account with a margin deposit and sell short U.S. Treasury notes equal to the amount of the desired tax benefit. The client would then contribute the brokerage account with the still-open position to a partnership in exchange for a 99.9-percent interest in the partnership and the partnership's assumption of the short sale obligation. The partnership would not have to account for the short sale obligation as a partnership liability, and the strategy would

allow the client to overstate his capital contribution by the amount of the omitted liability.[5]

Kornman controlled, directly or indirectly, a number of dormant, preexisting corporations. On December 28, 1999, the ownership of 11 of these corporations[6] (11 corporations) was each transferred to 11 different trusts, from the 60 trusts formed earlier by Kornman and Canada.

On January 18, 2000, Heritage lent each of the 11 corporations $1,100,000 repayable on demand with interest on December 28, 2000. Each corporation used these funds to open an individual brokerage account at DLJ (DLJ accounts), and each corporation engaged in a short sale of U.S. Treasury notes with a value of $50 million. Each corporation received approximately $50 million in proceeds and accrued interest subject to the obligation to replace the securities at the closing of the short sale. Each corporation contributed its DLJ account to a limited

---

[5]Eventually this type of transaction was commonly referred to as a "Son of BOSS" technique, a bond option sale strategy using subch. K entities.

[6]The corporations involved were: CA Producer, Inc., CONN Producer, Inc., GW Producer, Inc., Heritage Producer, Inc., K Life Producer, Inc., MN Producer, Inc., PL Producer, Inc., SC Producer, Inc., TA Producer, Inc., WCL Producer, Inc., and VirtualMalls.com, Inc. Heritage intended to use only S corporations; however, one C corporation was included by mistake. All were incorporated in Delaware. Four of the S corporations were incorporated in 1989, three in 1995, one in 1991, and one in 1999. Kornman indirectly owned the stock of the C corporation and directly owned the 10 S corporations until Dec. 28, 1999.

partnership (trading partnership) in exchange for a 99.9-percent limited partnership interest and the assumption of the short sale obligation.  Additionally, each corporation contributed a proportionate amount of cash in exchange for a 0.1-percent interest as the general partner in each trading partnership.

On January 30, 2000, each corporation closed its short sale position at a loss by purchasing replacement securities with the proceeds of the short sale.  On January 31, 2000, each trading partnership entered into partially hedged short and long positions in $4 million aggregate face amounts of U.S. Treasury notes that closed on February 10, 2000, at a net loss.

On February 28, 2000, the balance remaining in the margin account of each corporation was approximately $825,000, consisting of the initial margin deposit plus interest, less out-of-pocket losses.  This amount was transferred back to each of the 11 corporation accounts.  On March 1, 2000, the 11 corporations transferred the funds out of the corporation accounts to Heritage as partial payments on the original loans, leaving an outstanding principal balance on each of the loans of approximately $275,000.

On December 28, 2000, the loans from Heritage to the 11 corporations became due, but the corporations had depleted their assets.  Walker issued 11 checks from Heritage, each in the

amount of $550,000, payable from a Heritage bank account at American Century to each of the 11 corporations' accounts.

Walker determined the payoff amount of $550,000 on the basis of the following. Walker estimated that the outstanding loan obligation of each corporation was approximately $275,000 (loan repayment), plus a gross-up for the Federal income tax due from each of the 11 corporations for income received (gross-up). This amount was rounded up to $550,000 for administrative ease. None of the corporations or trusts issued any invoices or accounting statements indicating that they had performed any activities for which they should be paid.

On December 29, 2000, Walker issued the 11 checks on an American Century account from Heritage and delivered them to herself in her capacity as an officer of the 11 corporations. The checks were credited as having been received the same day, December 29, 2000. Walker did not deposit the checks into the 11 corporate accounts at Bank of Texas until January 23, 2001. On January 26, 2001, Bank of Texas presented the checks for payment, but American Century refused to honor them. On January 29, 2001, Walker was informed that American Century had returned all 11 checks unpaid. On January 30, 2001, Walker authorized a wire fund transfer of $6,050,000 from American Century directly to Heritage's separate account at Bank of Texas. Thereafter, $550,000 was transferred from Heritage's Bank of Texas account to

each of the 11 corporations' accounts via intrabank transfer, in lieu of the original checks.

Return Preparation and Audit

Heritage was a cash method taxpayer.  It timely filed its tax year 2000 and 2001 partnership return after submitting accounting information, including the characterization of the payoff amounts as research and development expenses, to Deloitte & Touche (Deloitte), who thereafter prepared the returns.  On its tax year 2000 partnership return Heritage claimed a deduction of $6,069,189 for research and development,[7] including $6,050,000 attributable to the 11 checks.  On its tax year 2001 partnership return, as a protective position Heritage claimed a deduction for the same research and development expenses of $6,050,000.

On April 14, 2004, respondent issued Holdings the FPAA for tax year 2000.  Respondent denied Heritage's claimed research expenses of $6,069,189 as not related to Heritage's trade or business under section 162 or, alternatively, not qualified research and development expenses under section 174.  Respondent also recharacterized the aggregate payoff amount as a constructive

---

[7]Holdings noted that the expense may have qualified as an inventory expense rather than a research and development expense but did not develop this argument.

distribution to Kornman in excess of his outside basis in the partnership.[8]

On April 15, 2005, respondent issued Holdings the FPAA for tax year 2001. Respondent denied Heritage's protective position and determined that the $6,050,000 was not an ordinary business expense.[9]

Holdings, as tax matters partner, timely filed a petition with the Court for tax year 2000 on July 19, 2004. It also timely filed a petition for tax year 2001 on July 14, 2005. On March 1, 2006, these cases were consolidated.

## OPINION

As a general rule, the Commissioner's determinations in a notice of deficiency are presumed correct and the taxpayer has the burden of establishing that the determinations are erroneous. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Consequently, the taxpayer bears the burden of proving that he is allowed any deduction that would reduce his deficiency. <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992). With respect to

---

[8]Respondent later conceded the outside basis issue for 2000; therefore the Court will consider only the issue of deductibility.

[9]After receiving the tax year 2001 FPAA, Holdings filed amended returns for the 11 corporations, reversing the $6,050,000 of income received from Heritage. Each entity received a refund check from the Government. Each entity negotiated the refund check in the amount of $223,349.68. These entities are not parties to this proceeding.

penalties, the burden of production is placed on the Commissioner. Sec. 7491(c).

## I. The 11 Payments Are Tax Year 2001 Items.

Holdings argues that the disputed deduction is a partnership item for tax year 2000. A cash method taxpayer may deduct expenditures for the taxable year in which they are paid. Sec. 1.461-1(a)(1), Income Tax Regs. A check is not a final payment relieving a debtor of a liability but is rather a conditional payment that becomes absolute once the check is presented to the bank. See Weber v. Commissioner, 70 T.C. 52, 57 (1978); Thorpe v. Commissioner, T.C. Memo. 1998-115. The subsequent payment of the check relates back to the date of delivery, which allows the taxpayer to claim the deduction as of the date of delivery even when a check is presented and honored during a later year. Weber v. Commissioner, supra at 57. However, when a check is not presented or honored, the Court has held that no payment ever occurred because the condition upon which the conditional payment rested was never satisfied. Id.; Estate of Hubbell v. Commissioner, 10 T.C. 1207, 1208 (1948).

The record reflects that Walker, on behalf of Heritage, issued and delivered the 11 checks to herself, on behalf of the 11 corporations, on December 28, 2000. Walker did not deposit the checks until January 23, 2001. American Century did not honor the checks and informed Walker that the payments would not be

processed.  Because the checks were not presented and honored in due course, they do not constitute payment for tax year 2000.

Further, the payments in question were not made via the checks drafted on December 28, 2000.  Walker canceled the checks in 2001, and the payments were made via a different funding mechanism and in a different order.  Rather than transfer funds via checks written from Heritage's American Century account to the 11 corporations' accounts at Bank of Texas, Heritage first had to wire transfer funds from American Century to its own account at Bank of Texas, then process intercompany transfers from Heritage to the 11 corporations' Bank of Texas accounts.  As the payments were actually made in 2001, the payoff amounts are therefore tax year 2001 items.

II. The 11 Payments Are Not Qualified Research Expenses.

Section 174(a) provides that research or experimental expenditures paid or incurred during the taxable year in connection with a taxpayer's trade or business may be deducted currently rather than capitalized. Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403.  The taxpayer must establish the right to treat expenditures as deductible expenses under section 174.  Coors Porcelain Co. v. Commissioner, 52 T.C. 682, 697-698 (1969) (holding that the taxpayer was not entitled to a deduction under section 174 because, in part, the taxpayer did not prove that the expenditures

met the definition of research and development under section 174), affd. 429 F.2d 1 (10th Cir. 1970).

The term "research or developmental expenditures" is defined as "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense."  Sec. 1.174-2(a)(1), Income Tax Regs.  The term generally includes all such costs incident to the development or improvement of a product.  Id.

The term "product" includes "any pilot, model, process, formula, invention, technique, patent or similar property, and includes products to be used by the taxpayer in its trade or business as well as products to be held for sale".  Sec. 1.174-2(a)(2), Income Tax Regs.  Included costs are those to develop the technique and concept of the product, not the product itself.  See Mayrath v. Commissioner, 41 T.C. 582, 590-591 (1964), affd. 357 F.2d 209 (5th Cir. 1966); Rev. Rul. 73-275, 1973-1 C.B. 134.

The Court generally gives the terms "experimental" and "laboratory" their plain and ordinary meanings.  TSR, Inc. & Sub. v. Commissioner, 96 T.C. 903, 914 (1991).  In TSR, Inc. & Sub., the Court concluded that "'Experimental' is defined as 'relating to, or based on experience'" and "'Laboratory' is defined as 'a place devoted to experimental study in any branch of natural science or to the application of scientific principles in testing and analysis'" according to the definition of those two terms in

Webster's Third New International Dictionary.  See id.  The Court has held further that "The goal of the research must be scientifically reasonable * * * It requires some element of experimentation."  Agro Science Co. v. Commissioner, T.C. Memo. 1989-687, affd. 934 F.2d 573 (5th Cir. 1991).  The Court has consistently held that research and development expenditures are generally those expenditures related to scientific and laboratory-based activities.

The expenditures may qualify as research and development expenses in "the experimental or laboratory sense" if they are incurred for activities to "eliminate uncertainty concerning the development or improvement of a product."  Sec. 1.174-2(a)(1), Income Tax Regs.

Uncertainty exists if the information available to the taxpayer does not establish the capability or method for developing or improving the product or the design of the product. Id.  Whether an expenditure qualifies as a research expenditure depends on the nature of the activity to which the expenditures relate, not the nature of the product or improvement being developed or the level of technological advancement of the product.  Union Carbide Corp. & Subs. v. Commissioner, T.C. Memo. 2009-50; sec. 1.174-2(a)(1), Income Tax Regs.  The taxpayer must perform activities intended to discover information not otherwise available regarding the capability of the product or for improving

the design or development of the product.  Sec. 1.174-2(a)(1), Income Tax Regs.

Holdings alleges that the payoff amounts were research and development expenses as Heritage incurred the expenses to "develop" a set of shelf corporations with embedded losses.  The Court disagrees and denies Heritage the research and development expense deduction.

The payoff amounts fail to meet the section 174 requirement that the expenditures be for research in the experimental or laboratory sense.  The payments were not made for scientific activities.  The payoff amounts consisted of the amount outstanding for each corporation on its loan from Heritage, a tax gross-up amount, and an arbitrary amount to make the payment a round number.  While a portion of the loss may have been deductible as a short-term capital loss, the remainder would have been a nondeductible investment expense.  Holdings relies on the fact that there were a number of employees of Heritage engaged in researching tax planning strategies and identifying high-net-worth individuals, even though these activities were performed by a different Heritage subsidiary.  These activities are irrelevant to determining whether the payoff amounts are research and development expenses.  The activities were unrelated to the payoff amounts, and further, any expenses associated with those activities were deducted through a different Heritage subsidiary.

Further, the payoff amounts do not qualify as research and development expenses as they were not incurred to eliminate uncertainty concerning the development of a product. The uncertainty Heritage wished to eliminate was whether the tax planning structure created would be useful in a tax system without the generation skipping transfer tax exemption. The uncertainty on Heritage's part would be resolved by a change in the tax law, not by any actions undertaken by Heritage.

III. The 11 Payments Are Not Ordinary and Necessary Business Expenses.

Section 162 allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Sec. 162(a); see Deputy v. du pont, 308 U.S. 488, 495 (1940). "[A]ll expenses of every business transaction are not deductible. Only those are deductible which relate to carrying on a business." Higgins v. Commissioner 312 U.S. 212, 217 (1941). To determine whether a taxpayer is conducting a trade or business requires an examination of the facts involved in each case. Id. Generally, an expense is ordinary if it is considered normal, usual, or customary in the context of the business in which it arose. Deputy v. du pont, supra at 495. An expense is necessary if it is appropriate and helpful to the operation of the taxpayer's trade or business. Commissioner v. Tellier, 383 U.S. 687, 689 (1966); Carbine v. Commissioner, 83 T.C. 356, 363 (1984), affd. 777 F.2d 662 (11th Cir. 1985).

Investing one's money and managing those investments do not constitute a trade or business. <u>Whipple v. Commissioner</u>, 373 U.S. 193, 202 (1963). Without more than time, energy, and expense, such activities do not rise to the level of constituting expenses in a trade or business. <u>Id.</u> The income and losses derived from such activities may demonstrate that the investment has value but this can be distinguished from a trade or business of the taxpayer. <u>Id.</u>

Holdings alleges that the payoff amounts are attributable to Heritage's trade or business as the payoff amounts were necessary to create a valuable asset for Heritage in the future. The Court disagrees. Heritage's business was consistently described as estate planning and issuance of life insurance. Its typical business expenditures included the cost of educating its employees through membership in legal and estate planning groups, attending conferences, and one-on-one discussions with legal professionals. Heritage also spent funds on subscriptions to legal publications, industry publications, and research services. While Heritage and its employees marketed estate planning techniques to its clients, the clients' lawyers were responsible for drafting and conjugation of the actual transactions. Heritage's business purpose was not selling "off the shelf" entities with embedded losses.

Looking specifically to the components of the payoff amounts, none of the components can be considered ordinary and necessary

business expenses.  The loan repayment amount was actually the loss each of the 11 corporations incurred while engaging in short sale transactions.  Heritage has not shown that it was obligated to repay the 11 corporations for losses from investment activity.  There is no evidence that any activity was performed by the 11 corporations that should be reimbursed by Heritage.  There are no invoices from the 11 corporations accounting for the loan payment component of the payoff amounts.  The 11 corporations simply undertook an investment transaction that resulted in a loss, for which they were reimbursed by Heritage, their lender.

Holdings further failed to present any evidence as to why the gross-up and amounts attributable to rounding up should be considered an ordinary and necessary business expense.  There is no evidence justifying the gross-up calculation or establishing which entity the gross-up was designed to make whole and no evidence showing an obligation to do so.  Finally, the component attributable to rounding is an arbitrary amount that has no basis in fact or law for deductibility.

IV.   <u>The Payoff Amounts Are Not Constructive Distributions</u>.

The TEFRA provisions require that partnership items be determined at the partnership level.  Secs. 6221, 6226(f).  The term "partnership item" includes any item required to be taken into account for the partnership taxable year to the extent that the regulations provide that such item "is more appropriately

determined at the partnership level than at the partner level."
Sec. 6231(a)(3). The applicable regulations define the term to include the partnership aggregate and each partner's share of items of income, gain, loss, deduction, or credit of the partnership. Sec. 301.6231(a)(3)-1(a)(1)(i) and (ii), Proced. & Admin Regs. Partnership items also include the amount of contributions to and distributions from the partnership, including any associated liabilities. Sec. 301.6231(a)(3)-1(a)(1)(v), (4), (c)(2)(iv), Proced. & Admin. Regs.

Section 704(a) generally provides that a partner's share of income, gain, loss, deduction, or credit shall be determined by the partnership agreement. If the partnership agreement does not specify the distributive share of each partner, then each partner's share of partnership items is based on its ownership interest. Sec. 704(b)(1).

Respondent argues that the Court should recharacterize the payoff amounts as constructive distributions from Heritage to Kornman, contrary to the Heritage ownership structure. To determine that the payoff amounts should be treated as distributions to Kornman, the Court would have to disregard the partnership. However, respondent does not argue or prove that Heritage is a sham partnership. Tikchick and Koshland are unrelated partners that paid valid consideration for their interests in Heritage. The payoff amounts are not deductible by

Heritage, and pursuant to TEFRA the additional income should be distributed to each partner of Heritage pursuant to the percentage ownership of each partner.

V. Accuracy-Related Penalty Under Section 6662

A. Heritage's Position Was Negligent.

The applicability of penalties which relate to an adjustment to a partnership item are determined at the partnership level. Sec. 6221.  Assessment of a penalty relating to an adjustment of a partnership item is based on partnership-level determinations. Sec. 301.6221-1T(c), Proced. & Admin. Regs.  After a final partnership-level adjustment has been made to a partnership item in a partnership proceeding, a corresponding computational adjustment must be made to the tax liability of each partner. Desmet v. Commissioner, 581 F.3d 297 (6th Cir. 2009), affg. in part and remanding Domulewicz v. Commissioner, 129 T.C. 11 (2007). A computational adjustment then may affect the amounts of the items on the partner's return.  Id.  Partnership-level determinations include all legal and factual defenses to a penalty, other than partner-specific defenses that must be raised through a separate refund action following assessment and payment. Sec. 301.6221-1T(c) and (d), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999).

Section 6662(a) and (b)(1) and (2) imposes a 20-percent penalty on an underpayment of tax required to be shown on a return

if the underpayment is attributable to a taxpayer's negligence or disregard of rules or regulations or substantial understatement of income tax.  For purposes of applying penalties to partnership items, the determination of negligence depends on the actions of the general partner of a limited partnership or a managing partner of an LLC.  See generally Wolf v. Commissioner, 4 F.3d 709, 715 (9th Cir. 1993), affg. T.C. Memo. 1991-212; Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984).

For purposes of section 6662, the term "negligence" includes any failure to make a reasonable attempt to comply with Code provisions.  Sec. 6662(c).  "Negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964).  Negligence is strongly indicated where a taxpayer "fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

For purposes of section 6662, the term "disregard" includes any careless, reckless, or intentional disregard.  Sec. 6662(c).  A disregard of the rules is "careless" if "the taxpayer does not

exercise reasonable diligence to determine the correctness of a return position". Sec. 1.6662-3(b)(2), Income Tax Regs. A disregard is "reckless" if the taxpayer "makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Id. A taxpayer may avoid the penalty under section 6662 where there is a reasonable basis for the position taken on the return. Sec. 1.6662-3(b)(1), Income Tax Regs. The reasonable basis standard is not satisfied by a position that is "merely arguable" but is based on "taking into account the relevance and persuasiveness of the authorities, and subsequent developments." Sec. 1.6662-3(b)(3), Income Tax Regs. Relevant authorities include the Code and other statutes; proposed, temporary, and final regulations; revenue rulings and revenue procedures, and other authorities listed in section 1.6662-4(d)(3)(iii), Income Tax Regs.

The classification of the payoff amounts as research and development expenses was negligent and in disregard of rules and regulations. There is no evidence that Walker or anyone else investigated the appropriateness of the tax treatment of the payoff amounts. Walker, while Heritage's accountant, was not a tax professional and had never acquired any post-high-school professional degrees. Despite this lack of familiarity with the law, she determined the classification of the payoff amounts

without consultation and without confirming the defensibility of the position.  Further, Holdings noted that the expenses might have been better classified as inventory-related expenses, indicating that Heritage's return filing was not well thought out.

B. Heritage Did Not Act Reasonably or in Good Faith.

The accuracy-related penalty may be avoided if Heritage can show that it acted reasonably and in good faith.  Sec. 6664(c); sec. 1.6664-4, Income Tax Regs.  The determination of whether a taxpayer acted in good faith is factual and made on a case-by-case basis.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Relevant factors for the Court to consider include the knowledge and experience of the taxpayer and reliance on the advice of a qualified professional.  Id.

In order to prevail on this defense a taxpayer must generally establish, by a preponderance of the evidence, that "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Neither Walker nor Heritage sought or received any professional tax advice with regard to the treatment of the payoff amounts as research and development expenses.  Walker classified

the payments as such according to her own belief as to what was appropriate without conducting an investigation of the proper treatment of the payments, either within Heritage or through an outside professional.

Further, Heritage may not characterize Deloitte's preparation of the returns as reliance on a tax professional. The exception presumes that the taxpayer relied on the advice of a tax professional and that tax professional made the tax error. Here, Heritage did not rely on tax advice from Deloitte. Heritage presented the accounting records and characterization of tax items by Walker. These numbers were then entered into the return without further tax advice from Deloitte. Deloitte provided no tax advice to Walker or Heritage that can be relied on to support the tax positions taken.

In reaching these holdings, the Court has considered all arguments made and, to the extent not mentioned, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

Decisions will be entered under Rule 155.