LUMENETICS, DENNIS R. DI RICCO, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lumenetics
Docket No. 114-88[1]
United States Tax Court
T.C. Memo 1992-630; 1992 Tax Ct. Memo LEXIS 654; 64 T.C.M. (CCH) 1161; October 26, 1992, Filed *654 Decision will be entered for respondent. Dennis R. Di Ricco, pro se. For Respondent: Robert W. Towler. RUWE
RUWE
MEMORANDUM OPINION RUWE, Judge: For the sake of convenience and brevity, our findings of fact and opinion are combined. Some of the facts have been stipulated. The stipulation of facts, supplemental and second supplemental stipulations of fact, and attached exhibits are incorporated herein by this reference. At the time of filing the petition, the principal place of business of the Lumenetics partnership was in San Mateo, California. Petitioner Dennis R. Di Ricco, the tax matters partner, also resided in San Mateo, California. By notice of final partnership administrative adjustment (FPAA), dated October 1, 1987, respondent disallowed a deduction in the amount of $ 3,550,000 which was reported on the partnership's 1983 Return of Income (Form 1065) as "marketing expenses". Petitioner bears the burden of proving that the partnership is entitled to the deduction. Rule 142(a). [2] Some of the reasons stated by respondent for disallowing the deduction were the partnership's failure to establish that: (1) Its activity constituted a trade or business; (2) it paid or *655 incurred the expenses claimed; (3) the expenses constituted ordinary and necessary business expenses; and (4) the claimed expenditures were not in the nature of capital or preoperating expenses. Respondent determined that the partnership could not deduct the alleged "marketing expenses" under section 162. There is insufficient evidence in the record to conclude otherwise. The basic facts that emerge from a record that is less than clear are as follows. Lumenetics Energy Corp. (LEC) was formed in the early 1970's as a lighting service company that sold lighting products manufactured by other companies. By the early 1980's, LEC had expanded from a lighting service company to an energy services company. As such, LEC sought to advise clients on energy conservation and to reduce clients' overhead by reducing energy costs. *656 One way to market its goods and services was to offer to "share" the saved energy costs. Specifically, LEC would agree to receive a portion of its clients' savings from reduced energy costs. The problem with the "shared savings" approach to marketing is that it is capital intensive, requiring an upfront investment, the return on which is projected over a long period of time. Because of LEC's inability to bear the financial burden of its shared savings program and its inability to capture sufficient market share, LEC did not have sufficient funds to sustain its operations in 1982. In order to address these problems and reestablish the company, LEC sought the services of Hamlin and Harkins, Ltd., a full-service management consulting firm. A new company, American Lumenetics Corp. (ALC), was formed to focus on marketing and to promote the "shared savings" program. Although LEC continued to exist, its function was limited to purchasing products for resale to ALC. The two entities were closely tied to one another. [3] The record suggests that neither of these entities developed the lighting and energy equipment that was to be supplied to customers. Instead, it appears that LEC identified *657 and acquired energy conservation products already on the market, and ALC marketed them as part of an energy conservation package to clients, primarily on a "shared savings" basis. The creation of ALC did not alleviate the revenue shortfall which plagued LEC in late 1982. In late 1982, *658 the principals of LEC came in contact with Dennis R. Di Ricco. Mr. Di Ricco was an attorney who specialized in tax law. Beginning in 1980, Mr. Di Ricco began organizing and promoting a number of partnerships. At least part of the focus of the partnerships was the Federal tax benefits that investors were told they would derive from their investment. It appears that Mr. Di Ricco offered to help LEC with its capital shortfall by forming a limited partnership. The result was the Lumenetics Limited Partnership (sometimes referred to as Lumenetics or the partnership). Lumenetics is a California limited partnership promoted by Mr. Di Ricco in late 1983. Four hundred eighty units were offered for sale to investors for $ 7,500 per unit. The private placement memorandum issued in conjunction with the Lumenetics offering states that investors were required to pay $ 2,500 of the $ 7,500 in cash and execute a secured, non-interest-bearing recourse note in the amount of $ 5,000 for the balance. These notes were allegedly due in October of 1992. Although petitioner contends that Lumenetics investors executed these promissory notes, petitioner did not introduce a single one into the record *659 to support this allegation. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947) (failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to presumption that, if produced, it would be unfavorable). In the private placement memorandum for Lumenetics under the heading "Advantage to the Investor", it is stated: Investment in this Partnership is structured to provide certain income tax and investment advantages. The investment is designed to provide approximately a 300% income tax deduction for each dollar initially invested. It is anticipated that the Limited Partners will receive net profits from the energy conservation lighting rented, leased, and sold for twenty (20) years from the date of the first sale after the marketing funds are transferred to AMERICAN LUMENETICS CORPORATION. Pursuant to the terms of a "marketing agreement" between Lumenetics and ALC, ALC was to perform marketing services for Lumenetics by promoting and locating suitable market outlets for the rental, lease, and sale of energy *660 conservation lighting. [4] The agreement called for Lumenetics to pay ALC $ 3,600,000 for these services. Of this, $ 1,200,000 was to be in cash and secured short-term notes, and the balance was to be in the form of a secured, non-interest-bearing promissory note that was payable on September 30, 1992. *661 The evidence in the record is insufficient to prove the amount of cash that Lumenetics actually transferred to ALC or that any notes were actually given to ALC. Indeed, the evidence indicates that in July of 1985, ALC attempted to obtain the notes from petitioner but petitioner refused to deliver them. [5] In an amendment to the marketing agreement, purportedly executed in April 1984, ALC agreed to pay 30 percent of its quarterly net profits for a period of 20 years to Lumenetics. The copy of this amendment to the marketing agreement, which is in the record, is undated and not executed by any representative of Lumenetics. The amendment states that the parties originally intended to include this provision as part of the original marketing agreement. This seems like an extremely important part of the arrangement, and we have difficulty believing that parties bargaining at arm's length would simply forget to include something as significant as this in their written agreement. *662 Lumenetics also executed a "franchise agreement" with LEC. This agreement states that it commences on October 1, 1983, but the agreement itself does not show the date of execution. The stated purpose of the franchise agreement is to establish the terms under which Lumenetics grants its license to use ALC's marketing services for the sale of LEC lighting and equipment. Under this franchise agreement, LEC was required to pay 30 percent of its quarterly net profits for a period of 20 years to Lumenetics as a franchise fee for use of the marketing services provided by Lumenetics. These marketing services were apparently the same services that ALC had agreed to provide to Lumenetics. [6] In November of 1983, Lumenetics and LEC executed a clarification to their franchise agreement in which Lumenetics made the additional promise to purchase and cause entities it controlled, including ALC, to purchase all heating, air conditioning, ventilation, lighting, and supplies from LEC. [7]
*663 Much of the evidence introduced to support the substance and business purpose of the transactions in issue was either testimony of petitioner Dennis R. Di Ricco or other evidence that was either prepared by, or otherwise dependent upon, the credibility of Mr. Di Ricco. Based upon our observations and a review of the entire record, we do not find Mr. Di Ricco to be credible. On September 20, 1989, Mr. Di Ricco pled guilty to, and was convicted of, violating section 7206(2) for aiding and assisting in the preparation of false tax returns for two of the limited partners in the Lumenetics partnership, Joseph Isgro and Bernard Magnussen. The conviction was based upon the following charge related to deductions and losses reported by Lumenetics for 1983: The Grand Jury Further Charges: THAT From on or about April 15, 1984 to on or about October 19, 1984, within the Northern District of California and elsewhere, DENNIS RONALD DiRICCO, defendant herein, a resident of San Mateo County, California, did willfully aid and assist in, and procure, counsel, and advise the preparation and presentation to the Internal Revenue Service, of U.S. Individual Income Tax Returns, Forms 1040, either *664 individual or joint, for the taxpayers and calendar years hereinafter specified, which were false and fraudulent as to material matters, in that they represented that the said taxpayers were entitled under the provisions of the Internal Revenue laws to claim deductions for partnership losses attributable to the Lumenetics partnership in amounts hereinafter specified, whereas, as the defendant then and there well knew and believed, the said taxpayers were not entitled to claim deductions in said amounts, but of lesser amounts. On September 20, 1989, Mr. Di Ricco also pled guilty to, and was convicted of, the offense of conspiracy to defraud the United States in violation of 18 U.S.C. sec. 371 and of the offense of obstruction of justice in violation of 18 U.S.C. sec. 1503. These convictions were based upon the following charges in the indictment: COUNT THREE: (Title 18, United States Code, Section 371) The Grand Jury further charges: THAT Beginning on a date presently unknown to the Grand Jury, but no later than September, 1983, and continuously thereafter up to and including September, 1985, in the State and Northern District *665 of California, DENNIS DI RICCO, and KEVIN LEONG defendants herein, did unlawfully, knowingly and willfully combine, conspire, and agree with each other and with ALION ANDERSSON and others both known and unknown to the Grand Jury, to defraud the United States, by: a. Hindering, impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service of the Treasury Department of the United States in the ascertainment, computation, assessment, and collection of revenue and in the investigation and prosecution of civil, administrative and criminal tax offenses in the Northern District of California * * *. * * * * COUNT SEVEN: (Title 18, United States Code, Section 1503) The Grand Jury further charges: THAT On or about February 6, 1984, in the State and Northern District of California, DENNIS DI RICCO defendant herein, did willfully and knowingly, corruptly endeavor to influence, obstruct and impede the due administration of justice in that DENNIS DI RICCO, an attorney at law, knowing that ALION ANDERSSON had the charges of conspiracy to distribute Cocaine and other charges pending in United States District Court *666 participated in the location of and aided, counseled and assisted in the destruction of approximately eleven (11) kilograms of cocaine hidden in ALION ANDERSSON's (Spy's) warehouse in Burlingame, California, after discussing with ALION ANDERSSON and CHARLES HINCK the fact that this cocaine would be important evidence in the pending proceedings in the District Court, in violation of Title 18, United States Code, Section 1503. Alion Andersson was a partner in Lumenetics during the year in issue. Petitioner has failed to meet his burden of proving that Lumenetics is entitled to deduct alleged "marketing expenses" under section 162. Petitioner failed to prove that Lumenetics paid or incurred the expenses deducted, that the amounts allegedly paid or incurred were not an investment as opposed to expenses incurred in connection with a trade or business, and that the transactions between Lumenetics and LEC and ALC were not shams that lacked economic substance. Although we are reluctant to draw conclusions based on the record before us, we believe that the record suggests that, at best, Lumenetics was investing in LEC's and ALC's shared-savings energy conservation *667 business and that it never conducted any business in its own right and therefore is not entitled to a deduction under section 162. See Levin v. Commissioner, 87 T.C. 698, 725-726 (1986), affd. 832 F.2d 403 (7th Cir. 1987); Green v. Commissioner, 83 T.C. 667, 690 (1984). Petitioner's primary position on brief is that the partnership is entitled to the claimed $ 3,550,000 deduction because these alleged expenses constitute research and experimental expenditures and are deductible under section 174. In order to deduct expenses under section 174, petitioner must prove, among other things, that Lumenetics paid or incurred expenses which were "research or experimental expenditures" as that phrase is used in section 174(a). Section 1.174-2(a), Income Tax Regs., defines "research or experimental expenditures" as: expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense. The term includes generally all such costs incident to the development of an experimental or pilot model, a plant process, *668 a product, a formula, an invention, or similar property, and the improvement of already existing property of the type mentioned. The term does not include * * * management studies, consumer surveys, advertising, or promotions. * * * [Emphasis added.] The record is devoid of any credible evidence indicating that the partnership paid or incurred any "research and development costs in the experimental or laboratory sense" in 1983, or paid anyone to conduct such research on its behalf. Indeed, the expenses that petitioner claims qualify for the section 174 deduction are identified on the partnership return as "marketing expenses". The evidence indicates that the corporation to which the partnership allegedly paid or incurred the $ 3,550,000 was in the marketing business. Assuming the partnership actually incurred these alleged "marketing expenses", expenses of this nature are clearly not deductible under section 174. Marketing expenses are not "research and development costs in the experimental or laboratory sense." [8] They are more in the nature of "consumer surveys, advertising, or promotions." Under these circumstances, we find that petitioner has failed to prove that *669 the partnership is entitled to deduct any expenses under section 174 in 1983. Finally, we address petitioner's argument that the statute of limitations bars respondent from assessing taxes against the Lumenetics partners with respect to partnership items. This issue was raised in the amended petition, but it has not been mentioned since. Petitioner bears the burden of proving that respondent *670 is barred by the statute of limitations, but he presented no evidence to support this claim. Indeed, the evidence indicates that respondent timely mailed the FPAA. Section 6229(a) establishes a 3-year period of limitations on assessing any tax imposed by subtitle A of title 26 with respect to any person which is attributable to any partnership item. The 3-year period begins with the later of the date the partnership return was filed, or the last day for filing such return. Mailing the FPAA suspends this 3-year period of limitations. Sec. 6229(d). Lumenetics requested, and respondent approved, an extension of time to file the partnership's 1983 return until October 15, 1984. The partnership's 1983 return is stamped received October 17, 1984. The FPAA is dated October 1, 1987. Under these circumstances, we believe respondent timely issued the FPAA. Decision will be entered for respondent. APPENDIX Name of Case
Docket No.
Biogenesis Marketing II, Connie
3878-90
Doherty Di Ricco, A Partner Other
than the Tax Matters Partner
Audre Marketing II, Steven J.
3896-90
Wechsler, A Partner Other than
the Tax Matters Partner
Audre Marketing I, Steven J.
3899-90
Wechsler, A Partner Other than
the Tax Matters Partner
Biogenesis Marketing I, Connie
3900-90
Doherty Di Ricco, A Partner Other
than the Tax Matters Partner
Synergistic Management Services, A
5958-90
California Limited Partnership,
John Morse, a Partner Other than
the Tax Matters Partner
Home Computer Software, A California
7357-90
Limited Partnership, Dennis R.
Di Ricco, Tax Matters Partner
Blueprint Software Banking, A California
7378-90
Limited Partnership, David W. Guild, A
Partner Other than the Tax Matters
Partner
Blueprint Software Advanced Expert, A
8352-90
California Limited Partnership,
Dennis R. Di Ricco, Tax Matters
Partner
Quoin Marketing, A California Limited
8354-90
Partnership, Dennis R. Di Ricco,
Tax Matters Partner
Synergistics-Blueprint Software, Dennis
24781-87
R. Di Ricco, Tax Matters Partner
Compu-Safe, Dennis R. Di Ricco,
31660-87
Tax Matters Partner
Biogenesis Research, George C.
33114-88
Jaynes, A Partner Other than
the Tax Matters Partner
Backsensor, A California Limited
20261-90
Partnership, Kevin Leong, A
Partner Other than the Tax
Matters Partner
Data Flex, A California Limited
20257-90
Partnership, Dennis R. DiRicco,
Tax Matters Partner
*671 Footnotes
1. Attached as an appendix is a list of docketed cases in which the parties have agreed to be bound by our decision in this case.↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. The record is unclear on the precise relationship of the two entities. The record indicates that both entities list their principal place of business as 4000 Moorpark Ave., Suite 209, San Jose, California. Also, the Lumenetics Limited Partnership offering memorandum assumes that LEC and ALC were controlled corporations as that term is used in sec. 1563(a)(2). The offering memorandum states that two members of ALC's board of directors, Donna M. Hamlin and Craig Harkins, are members of LEC's "management team". At an investors meeting, the chairperson of ALC stated that it was anticipated that the two entities would be merged by 1984. Under the franchise agreement discussed infra↩, ALC was required to buy its supplies from LEC.
4. When the original agreement was allegedly executed in October of 1983, Lumenetics was not even organized under the laws of the State of California. See Cal. Corp. Code sec. 15502 (West 1991); Brown v. Panish, 160 Cal. Rptr. 282, 283, 99 Cal. App. 3d 429↩ (1979). Lumenetics' private placement memorandum is dated Oct. 1, 1983, and its certificate of limited partnership (which states that its business is to market, not research and develop, computer software and hardware products) is dated Jan. 11, 1984. We note that none of the alleged investors in Lumenetics actually executed the certificate of limited partnership. Instead, Robert P. Steinjann, Lumenetics' general partner and Mr. Di Ricco's neighbor, executed the certificate of limited partnership apparently on behalf of the limited partners.
5. The balance sheet attached to ALC's corporate income tax return (Form 1120) for the taxable year ended Sept. 30, 1985, does not reflect the existence of the note from Lumenetics, nor do the balance sheets attached to the 1983, 1984, or 1985 partnership return of income tax (Forms 1065) of Lumenetics reflect any liability for such note.↩
6. The only "marketing expenses" deducted by Lumenetics in 1983 are the "marketing expenses" it allegedly paid ALC under the marketing agreement. ↩
7. The clarification indicates that the parties originally intended to include this in the original franchise agreement. This seems like an extremely important part of that agreement. Again, we have difficulty believing that parties bargaining at arm's length would simply forget to include something as significant as this in their written agreement. This agreement also gave LEC the exclusive right to use the marketing services of ALC.↩
8. "Experimental" is defined as "relating to, or based on experience." Webster's Third New International Dictionary, 800 (1986). "Laboratory" is defined as "a place devoted to experimental study in any branch of natural science or to the application of scientific principles in testing and analysis." Webster's Third New International Dictionary, supra at 1260. Taken together, the term "experimental or laboratory," as used in the context of section 1.174-2(a), Income Tax Regs., means scientific research and analysis. * * * [TSR, Inc. and Subsidiary v. Commissioner, 96 T.C. 903, 914↩ (1991).]