EFREM V. FUDIM AND MARGARITA L. FUDIM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fudim v. Commissioner
Docket No. 10309-91
United States Tax Court
T.C. Memo 1994-235; 1994 Tax Ct. Memo LEXIS 240; 67 T.C.M. (CCH) 3011; May 26, 1994, Filed *240 Efrem V. Fudim, pro se. For respondent: Mark J. Miller. PATE
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in petitioners' Federal income taxes of $ 661, $ 3,449, and $ 3,276 for 1986, 1987, and 1988, respectively. After concessions, the issues for decision are: (1) Whether the statutory period of limitations on assessment and collection for 1986 had expired before respondent issued the notice of deficiency; (2) whether respondent made an improper second examination of petitioner's books and records and, if so, whether the burden of proof is shifted to respondent; (3) whether respondent improperly assessed a deficiency for 1988; (4) whether petitioners *241 are entitled to deduct losses sustained on the rental of their time share condominiums; and (5) whether petitioners are entitled to research credits for 1986, 1987, and 1988. Each of the issues in this case is, in its own way, distinct from and yet interrelated with the other issues in the case. In order to effectively deal with the issues presented, we have broken our findings of fact into three parts: (1) Research and development activities; (2) losses on time share condominiums; and (3) procedural matters. The opinion that follows deals with these three issues in reverse order: (1) Procedural issues; (2) losses on time share condominiums; and (3) research credits. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. Petitioners resided in Milwaukee, Wisconsin, when they filed their petition. Research and Development Activities
Efrem V. Fudim (hereinafter petitioner) was born in the Ukraine, a part of the former Soviet Union, and holds a doctorate degree from the Institute of Control Sciences of the U.S.S.R. Academy of Sciences, Moscow. In 1979, he emigrated to the United States and settled in Milwaukee. From 1979 until 1985 petitioner worked *242 with the corporate applied research group at Johnson Controls. He is a senior member of the Institute of Electrical and Electronics Engineers and a member of the American Society of Mechanical Engineers. By December 1984, petitioner had published 38 scientific papers and been granted 39 patents by various countries. Margarita L. Fudim (hereinafter Mrs. Fudim), holds a mechanical engineering degree from the Moscow Institute of Chemical Machine Building. The record does not reveal in what capacity Mrs. Fudim was employed prior to 1986. During 1986, 1987, and 1988, she was employed as a computer programmer at Pansophic Systems first in Oakbrook and then in Lisle, Illinois. In 1985, petitioner formed Light Sculpting Co. (hereinafter Light Sculpting), a company primarily engaged in researching a process known as "rapid modeling" (also known as "rapid prototyping" or "desktop manufacturing") (hereinafter rapid modeling process). The rapid modeling process utilizes ultraviolet light and light-sensitive liquid polymers to fabricate plastic objects directly from instructions provided by a computer-aided design system. Because it is difficult for the light to penetrate thick layers *243 of polymers (thereby requiring multi-layers to be formed), petitioner also attempted to perfect the rapid modeling process by looking for alternatives (i.e., heat, ultrasonic energy) to solidify the parts when relatively thick models were to be formed. Petitioner obtained two U.S. patents on the rapid modeling process he developed. The first was issued on June 21, 1988, and the second on January 31, 1989. The first patent describes the rapid modeling process as follows: An improved method of forming three-dimensional objects comprises irradiating an uncured photopolymer by transmitting an effective amount of photopolymer solidifying radiation through a radiation transmittent material which is in contact with the uncured photopolymer. The transmittent material is a material which leaves the irradiated surface capable of further crosslinking so that when a subsequent layer is formed it will adhere thereto. Using this method multilayer objects can be made.
Use of the rapid modeling process allows industrial engineers to skip the expensive and time-consuming step of making models by either machining, casting, or molding. Instead, they can produce a model from computer data *244 which first creates a mask, which in turn is used to direct the light rays to contour the polymer with a high degree of accuracy. Modeling by this process takes minutes rather than months. As a result of his research, petitioner and Light Sculpting have been featured in numerous articles in both scientific and popular publications, and a number of major corporations (i.e., ALCOA, DuPont, Ford, Chrysler, and United Technologies) have become interested in petitioner's rapid modeling process. In 1992, petitioner was acknowledged by the United States Senator from Wisconsin, as a "mover and shaker in the high-tech industry of Wisconsin". During the years in issue, Light Sculpting was petitioner's sole trade or business. For the years in issue, in addition to his research activities, petitioner did some consulting work for Sundstrand, for which he was paid, on average, $ 1,500 a day. He also was paid a small amount for writing and reviewing scientific articles. Petitioner reported the following income and deductions for Light Sculpting on Schedule C. 1986
1987
1988
Consulting Fees
$ 17,220
$ 53,604
$ 63,842
Modeling Process
2,950
20,161
Scientific papers
590
300
Gross Receipts  17,810
56,554
84,302
Cost of Goods Sold
12,706
8,739
Gross Income  43,848
75,563
Deductions
14,783
25,344
27,528
Net Income  $ 3,027 $ 18,504
$ 48,035
*245 Petitioner did not claim any research credits attributable to his Light Sculpting activities for 1983, 1984, and 1985. Although the parties stipulated that petitioner claimed a research credit for 1986, we are unable to find an entry for that credit on his 1986 income tax return. However, because of the stipulation, we shall decide whether he is entitled to a research credit for 1986. Petitioner did claim research credits of $ 2,890 and $ 6,176, on his income tax returns for 1987 and 1988, respectively. These research credits were computed based on the amount petitioner paid for supplies, wages to Mrs. Fudim and their daughter Natalia Fudim (hereinafter Natalia), and petitioner's net self-employment income. Included in the supplies deducted on Schedule C were those expended in researching the rapid modeling process totaling $ 430, $ 2,295 and $ 3,863 for 1986, 1987, and 1988, respectively. Supplies used in research consisted of the photopolymer itself, alcohol or other solvents to wash it out, photo masks to control the light, the light source itself (bulbs, starters, etc.), fans to cool the light source, photometers to measure light intensity, and timers. Petitioner employed *246 Mrs. Fudim and Natalia as part-time workers. Mrs. Fudim, a mechanical engineer and computer programmer, assisted petitioner from May through December 1987 with designing, drafting, and performing experiments. She was paid $ 16 an hour for 600 hours of work (a total of $ 9,600), of which petitioner claims she spent 480 hours (80 percent) on research and development. [2] Natalia was paid between $ 6.40 and $ 8.00 an hour, for a total of $ 4,800, $ 5,900, and $ 9,859, in 1986, 1987, and 1988, respectively. [3] *247 Petitioner claims that Natalia spent 83.33, 69.81, and 80.00 percent of her time in 1986, 1987, and 1988, respectively, on research and development. Petitioner also claims that, in 1986, he spent 305.5 hours consulting and 3,000 hours in researching and developing his rapid modeling process (90.76% of his total time). For 1987 and 1988, he claims that he devoted at least 80 percent of his time on research and development. [4]
Time Share Condominiums
On March 21, 1983, petitioner purchased for $ 5,700 a 1-week interest in a time share condominium at the Island Gulf Resort, Madeira Beach, Florida. Petitioner warranted that he had purchased the unit for his "personal use". Under the agreement, petitioner was obligated to pay, annually, a proportionate share of common expenses, assessments, and maintenance fees, which started at $ 167.35 per week. On March 25, 1983, petitioner purchased for $ 10,200 a 2-week interest in a 99-year lease of a time share condominium at the Hideaway Islands Resort, St. Petersburg, Florida. The annual fee on this unit started at $ 137.50 per week. The agreement provided that the "premises will be for the sole use and enjoyment of the leaseholders their families and guests." It also provided that the "lessee verifies that this *248 lease was never offered as an investment and that such lease is entered into for vacation purposes only". Neither petitioners nor any member of their family personally used either of the time share condominiums during the years in issue. On Schedule E of their joint income tax returns for 1986, 1987, and 1988, petitioners deducted losses in connection with their time share condominiums as follows: 1986
Madeira
St. Pete
Beach
Beach
Income
Rent  $ 513 $ 1,060 Expenses
Advertising  66 83 Auto & travel  159 292 Maintenance  180 384 Supplies  6 13 Taxes  56 -0- Utilities  11 14 Interest  -0- 5 Depreciation  602 1,117 Loss  ($ 567)
($ 848)  1987
Madeira
St. Pete
Beach
Beach
Income
Rent  $ -0- $ 450   Expenses
Advertising  -0- 28 Auto & travel  48 77 Maintenance  -0- 380 Legal  25 -0- Supplies  21 33 Depreciation  559 1,038 Loss  ($ 653)
($ 1,106)
[1] 1988
Madeira
Beach
Income
Rent  $ -0- Expenses
Advertising  126 Auto & travel  78 Maintenance  179 Supplies  22 Depreciation  559 Loss  [2] ($ 864)
*249 In the notice of deficiency, respondent disallowed all of these losses under section 280A. Procedural Matters
In a letter dated July 17, 1989, from the Kansas City Service Center, respondent informed petitioners that the amount of the research credit they claimed on their 1988 income tax return exceeded the amount allowable for that year because the general business tax credit (which includes the research credit) [5] was "limited to the difference between income tax before credits (from Form 1040) and tentative minimum tax (from Form 6251)." Consequently, respondent disallowed $ 3,222 of the $ 6,176 research credit claimed by petitioners on their 1988 income tax return and directed petitioners either to explain why they had not erred in claiming the full amount of the research credit or to remit $ 3,222. *250 Petitioners had attached a Form 6765 (Credit for Increasing Research Activities) as part of their 1988 income tax return. Although that form contained an explanation of the limitation that gave rise to respondent's adjustments, petitioners ignored the limitation and erroneously reduced their tax by the full $ 6,176. Nevertheless, in response to respondent's letter of July 17, 1989, they requested additional information on the adjustment, and in addition, indicated that the disallowed research credit should be carried back to 1985, 1986, and 1987. On July 24, 1989, petitioner again notified respondent that the excess amount of the research credit should be carried back to 1985 for a $ 2,643 refund, and to 1986 for a $ 579 refund. On or about the same date, petitioners also filed amended income tax returns carrying back the $ 3,222 excess research credit, and claiming the 1985 and 1986 refunds. (Offsetting the carrybacks against the 1988 deficiency results in no net tax liability.) In a second letter from the Kansas City Service Center, dated October 13, 1989, respondent explained to petitioners that the adjustment was made pursuant to section 38(c)(1)(B). [6] In still another *251 letter from the Kansas City Service Center, dated November 6, 1989, respondent again requested that petitioners remit payment. Petitioners wrote back denying that they owed anything. Subsequently, in a letter from the District Director in Milwaukee, dated November 9, 1989, respondent informed petitioners that their Federal income tax returns for 1985, 1986, and 1987 had been selected for examination. In that letter, respondent stated that the items being examined were: "Income, Individual Retirement Account; *252 Contributions; Legal, Tax, Investment Counsel Fees, Job Hunting Expenses, Educational Expenses; Rental Income; Rental Expenses; salaries and Wages; Interest on Business Indebtedness; Pension/Profit Sharing Plan." That letter made no mention of research credits. On December 5, 1989, respondent wrote petitioners asking them to execute an agreement to extend the period of limitations on assessment and collection of income taxes for 1986 to April 15, 1991. With her letter, respondent enclosed a copy of IRS Publication 1035 (Rev. 8-87) entitled "Extending the Tax Assessment Period" explaining the nature of the statutory period of limitations and petitioners' options with respect to extending it. IRS Publication 1035 stated, in part, Our examiners request an extension period no longer than is necessary to complete the examination and any action necessary to close the case.
On December 12, 1989, petitioners signed and returned Form 872 (Consent to Extend Time to Assess Tax), in which they agreed, in part, that (1) The amount of any Federal Income tax due on any returns made by or for the taxpayers for the periods ended December 31, 1986, may be assessed at any time before April *253 15, 1991. However, if a notice of deficiency in tax for any such periods is sent to the taxpayers on or before that date, then the time for assessing the tax will be further extended by the number of days the assessment was previously prohibited, plus 60 days. (2) This agreement ends on the earlier of the above expiration date or the assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration. * * *
Between November 1989 and January 1990, respondent examined petitioners' books and records. On January 24, 1990, respondent sent petitioners reports of the examination changes for 1985 through 1988 as proposed by the examining agent (hereinafter examining agent's report). In the examining agent's report, respondent disallowed the losses petitioners sustained on the rental of their time share condominiums and some charitable contributions, but allowed the reduced research credits after taking into account the section 38(c)(1) limitation, and the carryback of the excess credit to 1985. Consequently, the examining agent's report showed that petitioners were due refunds of $ 3,222, $ 182, and $ 3 *254 for 1985, 1986, and 1987, respectively, and owed $ 322 for 1988. On February 1, 1990, petitioners signed off on the examining agent's report for all years. The report contained the following statement: Although this report is subject to review, you may consider it as your notice that your case is closed if you are not notified of an exception to these findings within 45 days after a signed copy of this report or a signed waiver, Form 870, is received by the District Director. If you agree, please sign one copy of this report, and return it in the enclosed envelope. Keep the other copy for your records. Consent to assessment and collection -- I do not wish to exercise my appeal rights with the Internal Revenue Service or to contest in the United States Tax Court the findings in this report. Therefore, I consent to: The overpayment, Line I plus any interest and adjusted by penalties.
On February 1, 1990, petitioners also signed a Form 3363 (Acceptance of Proposed Disallowance Claim of Refund or Credit) and a Form 2297 (Waiver of Statutory Notification of Claim Disallowance) agreeing to respondent's determination that their refund for 1986 was properly $ 182 instead *255 of the $ 579 they had claimed on their amended return. In a letter dated February 28, 1990, from the District Director in Milwaukee, respondent informed petitioners that she had accepted the examining agent's report. Nevertheless, in a letter from the Kansas City Service Center, dated March 5, 1990, respondent applied petitioners' 1989 income tax refund ($ 2,983) to the balance due for 1988 by reason of respondent's disallowance of the excess research credit for 1988. Petitioners objected to such application because it conflicted with the agreed results reflected on the examining agent's report. On May 21, 1990, petitioner wrote respondent still another letter complaining that he had not received the refunds shown on the examining agent's report. Meanwhile, respondent assigned petitioners' case to a reviewer in the Milwaukee District office, who reviewed the examining agent's work. The reviewer concluded that the research credit had not been properly evaluated and recommended that the case be sent back to the examining agent for further development of the issue. Instead of sending petitioners' case back to the examining agent, respondent reassigned it to a more experienced *256 auditor, who, with the approval of three of his supervisors, initiated procedures to reopen petitioners' case. On October 5, 1990, respondent sent a notice to petitioners, at their last known address, informing them that she intended to reexamine their books and records for 1986, 1987, and 1988. The auditor also informed petitioners by telephone and in writing that their case had been reopened. Complaining that respondent had already accepted the adjustments in the examining agent's report and that more than 45 days had elapsed since petitioners' acceptance of such results, petitioners refused to cooperate or meet with the auditor. Consequently on March 1, 1991, respondent issued petitioners a notice of deficiency for 1986, 1987, and 1988, in which she disallowed the losses claimed on the time share condominiums, a portion of the charitable contributions, and the research credits. [7] *257 The notice of deficiency for 1988 indicated that the $ 3,222 excess research credit had previously been assessed. [8]
In a letter from the Kansas City Service Center, dated March 4, 1991, respondent again notified petitioners that they had not paid the balance due for 1988 and that, unless full payment was received within 30 days, their property would be seized to pay the tax and interest due. On March 7, 1991, petitioner, through his patent attorney, wrote the IRS Problem Resolution Office in an attempt to unravel and remedy his problem. The IRS responded promptly stating that "We cannot put a hold on the account because you are filing claims for other years * * * there is nothing that we can do for the Fudims at this time." On April 22, 1991, respondent informed petitioners that part of their income tax refund for 1990 [9] *258 had been applied to pay balances due for 1985 and 1988. [10]
OPINION Procedural Issues
Statute of Limitations
Petitioners first contend that, because respondent issued the notice of deficiency after April 16, 1990 (April 15th was on a Sunday) the statute of limitations on 1986 had expired and no assessment could be made affecting their 1986 income tax liability. Although not entirely clear, it appears that petitioners are arguing that, even though the parties executed an agreement to extend the period of limitations on assessment of income taxes for 1986 until April 15, 1991, such agreement had terminated prior to the issuance of the notice of deficiency on March 1, 1991. Specifically, petitioners *259 contend that, upon their acquiescence to the examining agent's report on February 1, 1990, and respondent's acceptance of such report on February 28, 1990, the parties' agreement to extend the period of limitations for 1986 terminated. In general, section 6501(a) provides that taxes may be assessed within 3 years after the date an income tax return is filed. Under this rule, the 3-year period of limitations for 1986 would have expired on April 16, 1990. However, prior to that date, the parties executed a Form 872, consenting to extend the time for assessment to the earlier of April 15, 1991, or "the assessment date of an increase in the above tax that reflects the final determination of tax and the final administrative appeals consideration." Sec. 6501(c)(4). Because there was no increase in tax assessed for 1986, petitioners concede that the clause in the Form 872 pertaining to the assessment for increased tax is inapplicable to this case. Nevertheless, petitioners argue that, because respondent sent them IRS Publication 1035 when she requested that they sign Form 872, and because they relied on the statement in IRS Publication 1035 that IRS "examiners request an extension period *260 no longer than is necessary to complete the examination and any action necessary to close the case", that the extension expired on February 28, 1990, when respondent accepted the examining agent's report. In effect, petitioners are arguing that respondent should be estopped from issuing a notice of deficiency after accepting the examining agent's report. Estoppel is an equitable defense that is used by a party to defeat a claim, right, action, or assertion by an adverse party where the party shows that he or she detrimentally relied on a false representation or wrongful, misleading silence by the adverse party. Detrimental reliance is a primary element of an estoppel claim. [11]Heckler v. Community Health Services, 467 U.S. 51, 59 (1984). The doctrine of estoppel is applied against the Government with the utmost caution and restraint. Kronish v. Commissioner, 90 T.C. 684, 695 (1988). *261 Upon due consideration of the facts in this case, we fail to see merit in petitioners' claim. First, petitioners have taken the language in IRS Publication 1035 on which they rely [12] to support their estoppel-type argument out of context. It appears in a discussion explaining the two types of consents to extend the period of limitations: (1) "fixed date, flexible expiration" and (2) "open-ended". The thrust of the language is that respondent will not request more time than she feels is reasonably necessary to close a case. In other words, the focus of the language is on the date requested by respondent, not on the time an extension agreement terminates. Moreover, there is no statement in IRS Publication 1035 to the effect that once a case is administratively closed it cannot be reopened or that the acceptance of an examining agent's *262 report terminates the agreement to extend the period of limitations. In fact, the consent agreed to by the parties specifically states that the period of limitation is extended to April 15, 1991, or alternatively, the date on which an increase in tax is assessed. Since no increase in tax was assessed after the extension agreement was signed, we conclude that the language in IRS Publication 1035 on which petitioners rely does not estop respondent from issuing the notice of deficiency after her acceptance of the examining agent's report. [13]
Further, petitioner's argument that the acceptance of the examining agent's report by the parties was a final determination of his tax liabilities purports to equate it *263 with execution of a closing agreement, the only statutorily authorized method by which the Commissioner and the taxpayer can finalize the taxpayer's tax liability for a particular year. Sec. 7121; Estate of Meyer v. Commissioner, 58 T.C. 69, 70 (1972); see also Botany Worsted Mills v. United States, 278 U.S. 282, 288 (1929). However, signing an examining agent's report or a Form 870, [14] and its subsequent acceptance by respondent, does not constitute a closing agreement for purposes of section 7121. Estate of Barrett v. Commissioner, T.C. Memo. 1994-167; Smith v. Commissioner, T.C. Memo. 1991-412; Vitale v. Commissioner, T.C. Memo. 1988-233. Doing so merely waives the statutory notice requirements imposed upon respondent by section 6213(a). Consolidated Freightways, Inc. v. United States, 223 Ct. Cl. 443, 620 F.2d 862, 868 (1980); Maloney v. Commissioner, T.C. Memo. 1986-91. Consequently, we find that petitioners' tax liabilities for the years in *264 issue had not been finally determined and that the period of limitations with regard to petitioners' 1986 income tax liability had not expired when respondent issued the notice of deficiency. Burden of Proof
Petitioners contend that we should shift the burden of proof in this case to respondent because she improperly reopened their case after it had been closed. However, petitioner does not cite any authority for this argument.[15] At best, we can address petitioners' argument as relating to section 7605(b) which provides that: No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, *265 after investigation, notifies the taxpayer in writing that an additional inspection is necessary.
Section 7605(b) is violated when respondent conducts a second inspection of a taxpayer's books and records without first notifying the taxpayer that an additional inspection is necessary. Ballantine v. Commissioner, 74 T.C. 516, 524 (1980); United States Holding Co. v. Commissioner, 44 T.C. 323, 327 (1965). However, respondent did not inspect petitioners' books or records more than once. Respondent's initial adjustment of petitioners' 1988 research credit was based solely on information contained in petitioners' 1988 income tax return; no inspection of the books was made at that time. Therefore, the examining agent made the first inspection of petitioners' books. Subsequently, the auditor appointed to petitioners' case (after the reviewer rejected the examining agent's report), notified them that their case was being reopened and requested that they produce books and records to support the research credits they had claimed. Petitioners refused to cooperate with the auditor and he never inspected their books a second *266 time. Because there never was a second inspection of petitioners' books and records, respondent could not have violated section 7605(b). Accordingly, we find that petitioners are not entitled to relief under section 7605(b). Assessment of 1988 Taxes
Petitioner also contends that respondent's assessment of the disallowed excess portion of the research credit claimed for 1988 was erroneous because no notice of deficiency was issued prior to such assessment. In general, section 6213(a) provides that respondent may not assess income taxes prior to the issuance of a notice of deficiency to the taxpayer. However, if the taxpayer's return contains a "mathematical or clerical error" resulting in additional tax, respondent may notify the taxpayer, assess the tax due, make notice and demand, and commence collection *267 procedures, if necessary, without first issuing a notice of deficiency. Sec. 6213(b)(1); King v. Commissioner, T.C. Memo. 1993-160. The term "mathematical or clerical error" includes an error in addition, subtraction, multiplication, or division; incorrect use of any table, which is apparent from the return; inconsistent entries on the return; omission of information required to substantiate an entry; and an entry on a return of a deduction or credit whose amount exceeds a statutory limit. Sec. 6213(g)(2). Respondent notified petitioners that their 1988 income tax return contained an error attributable to their failure to apply the statutory limitation under section 38(c)(1) to the research credit they claimed. The amount of credit claimed on a return in excess of the applicable statutory limit constitutes a "mathematical or clerical error" pursuant to section 6213(g)(2)(E). Accordingly, respondent had authority to assess the deficiency attributable to that error without issuing a notice of deficiency. Petitioners also contend that respondent violated the restrictions on assessment provided in section 6213(a) by applying their refunds due for *268 1989 and 1990 against the balance due for 1988. However, respondent is authorized to collect taxes assessed, pursuant to section 6213(b)(1), 60 days after notifying the taxpayer that tax is due. Sec. 6213(b)(2)(B). Respondent applied petitioners' refunds due for 1989 and 1990 against the amount assessed for 1988, on March 5, 1990, and April 22, 1991, respectively. Because those dates were more than 60 days past July 17, 1989 (the day on which respondent notified petitioners that their research credit for 1988 was limited and that they owed an additional $ 3,222 for that year), we hold that respondent's offset was proper. Further, for these same reasons, we find that respondent did not violate petitioners' rights by sending them a notice of intent to seize their property for the unpaid balance due for 1988. Other Procedural Matters
Petitioners have raised a number of other arguments in support of their contentions that respondent was prohibited from reopening their case and had no authority to issue the notice of deficiency. For instance, they argue that respondent violated her own policy as to the reopening of closed cases set forth in Rev. Proc. 85-13, 1985-1 C.B. 514, *269 by reopening their case for "frivolous" reasons and without specifying how much extra tax would be collected after the reopening. We do not believe that respondent violated the policies and procedures provided in Rev. Proc. 85-13 in reopening their case as all of the steps required to reopen the case were properly followed. Petitioners also argue that their case, "probably among millions", was singled out for reopening and that respondent harassed them and discriminated against them. We find no evidence in the record that petitioners were harassed or singled out. We also cannot find any evidence that they suffered especially harsh treatment or that respondent's conduct in reopening their case was discriminatory. [16]
*270 Finally, we recognize that petitioners have raised a number of other procedural issues in their brief. We have examined each of them and find them all to be without merit. Substantive Issues
Having resolved the procedural issues raised by petitioners in favor of respondent, we now turn to the substantive issues before us. Losses on Time Share Condominiums
In the notice of deficiency, respondent disallowed all of the losses sustained by petitioners on their time share condominiums under section 280A. That section severely limits deductions with respect to a dwelling unit that is used by the taxpayer during the taxable year as a residence. [17] The term "dwelling unit" includes a house, apartment, condominium, mobile home, boat, or similar property, and all structures or other property appurtenant to such dwelling unit. Sec. 280A(f)(1)(A). The time share condominiums that petitioners owned were "dwelling units" within the meaning of section 280A(f)(1)(A). *271 A dwelling unit is considered as having been used as a residence by the taxpayer if its use for personal purposes exceeds the greater of 14 days or 10 percent of the number of days the unit is rented at a fair rental. Sec. 280A(d)(1). Sec. 280A(d)(2) provides that personal use of a dwelling unit by the taxpayer means use -- (A) for personal purposes by the taxpayer or any other person who has an interest in such unit, or by any member of the family * * * (B) by any individual who uses the unit under an arrangement which enables the taxpayer to use some other dwelling unit * * *; or (C) by any individual * * * unless for such day the dwelling unit is rented for a rental which, under the facts and circumstances, is fair rental. [Emphasis added.]
Neither petitioners nor any member of their family used their time share condominiums during the years in issue. However, section 280A(d)(2) also requires that petitioners show that no "other person who has an interest in such unit" used them during the taxable year. Because petitioners did not submit any evidence as to the use of the condominiums during the weeks other than their own, they have not shown that their condominiums *272 were not used "for personal purposes by * * * any other person who has an interest in such unit". Id. Accordingly, we hold that petitioners may not deduct their time share condominium losses. Petitioners argue that their interests in their time-share condominiums were property interests separate from those owned by the persons who had rights to use the condominiums during the other weeks of the year, and, therefore, the use of the condominiums during the other weeks of the year has no bearing on whether their dwelling units were used as a residence within the meaning of section 280A(d). While we agree that petitioners' time share interests were property interests separate from the interests held by other persons for the remaining weeks of the year, the statute requires that, in considering whether the dwelling unit was used for personal purposes, we take into account use by all persons who have an interest in such unit. Sec. 280A(d)(2)(A). Accordingly, the statute requires that we examine how the condominiums were used for the entire taxable year, not just during petitioners' period of ownership. See sec. 1.280A-3(f)(3), Proposed Income Tax Regs., 45 Fed. Reg. 52406 *273 (Aug. 7, 1980). Petitioners also argue that their time share condominiums fall within the exception in section 280A(f)(1)(B) excluding from the definition of "dwelling unit" "that portion of a unit which is used exclusively as a hotel, motel, inn, or similar establishment." There is nothing in the record that would even remotely support the conclusion that petitioners' time share condominiums were ever used "as a hotel, motel, inn, or similar establishment." We therefore reject petitioners' argument that they are covered by this exception. Research Credit
Finally, we must decide whether petitioners are entitled to research credits for 1986, 1987, and 1988. Section 41(a) allows a tax credit equal to 20 percent of the amount by which current qualified research expenses exceed the average of such expenses over the preceding 3 years. For taxable years after 1985, this credit is part of the general business credit allowed under section 38, and thus is subject to the various limitations applicable to that credit. Sec. 38(c). In general, "qualified research" is defined as research of a type with respect to which expenditures are deductible under section 174, which is undertaken *274 for the purpose of discovering information that is technological in nature, and the application of which is intended to be useful in the development of a new or improved business component of the taxpayer. Sec. 41(d)(1); TSR, Inc. v. Commissioner, 96 T.C. 903, 913 (1991). Qualified research expenses are composed of in-house research expenses and contract research expenses paid or incurred by a taxpayer in carrying on any trade or business. Sec. 41(b)(1). "In-house research expenses" include "wages paid or incurred to an employee for qualified services" and amounts paid or incurred for "supplies used in the conduct of qualified research". Sec. 41(b)(2)(A)(i) and (ii). For purposes of this section, "wages" include the net earnings of a self-employed individual reported on Schedule C. Secs. 41(b)(2)(D)(ii); 401(c)(1) and (2). "Qualified services" are services rendered in performing qualified research and in direct supervision or direct support of research activities. Sec. 41(b)(2)(B). "Direct support of research", as explained in section 1.41-2(c)(3)(ii), Income Tax Regs., includes: the services of a secretary for typing reports describing *275 laboratory results derived from qualified research, of a laboratory worker for cleaning equipment used in qualified research, of a clerk for compiling research data, and of a machinist for machining a part of an experimental model used in qualified research. Direct support of research activities does not include general administrative services, or other services only indirectly of benefit to research activities. * * *
If during the year an employee performed both qualified and nonqualified services, only the amount of wages relating to qualified services constitutes an in-house research expense. Sec. 1.41-2(d)(1), Income Tax Regs. Accordingly, In the absence of another method of allocation that the taxpayer can demonstrate to be more appropriate, the amount of in house research expense shall be determined by multiplying the total amount of wages paid or incurred for the employee during the taxable year by the ratio of the total time actually spent by the employee in the performance of qualified services for the taxpayer to the total time spent by the employee in the performance of all services for the taxpayer during the taxable year. [Id.]
However, if "substantially *276 all", i.e., at least 80 percent, of the services of an employee are qualified services, then all of such employee's services are considered qualified services. Sec. 41(b)(2)(B); sec 1.41-2(d)(2), Income Tax Regs. Although respondent argues otherwise, we have no doubt that during 1986, 1987, and 1988 petitioner was engaged in research and development for which a research tax credit under section 41 is allowable. His training and background certainly attest to his capability to develop the rapid modeling process. Moreover, the record includes contemporaneous letters and scientific articles acknowledging and describing petitioner's newly developed rapid modeling process. Most importantly, contemporaneously, petitioner was awarded two patents for the rapid modeling process which reflected the results of his research during 1986, 1987, and 1988. The first patent was granted on June 21, 1988, and the other on January 31, 1989. We are also satisfied that the supplies petitioner purchased were devoted to research. There is no evidence that petitioner used any supplies (other than the small amounts reflecting the difference between the amounts petitioner deducted and the amounts stipulated) *277 in his consulting work, and he derived only a minimal amount of income on the models he made during those years. Consequently, we are convinced such supplies were used in petitioner's research activity. Lastly, we must decide how much time petitioner, Mrs. Fudim, and Natalia spent engaged in qualified services during the years in issue. Because petitioner did not produce contemporaneous written records of the time and activities spent by himself, Mrs. Fudim, and Natalia, we must rely on his testimony and other evidence in the record. Based on the record, we have estimated the time spent on research and development under the principles set forth in Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). We are satisfied that, during 1986, 1987, and 1988, petitioner spent more than 80 percent of the time he worked with Light Sculpting engaged in qualified services. Although during those years petitioner derived a substantial amount of income from consulting work for Sundstrand, he was paid, on average, $ 1,500 a day. At this rate he worked an estimated 12 days, 36 days and 43 days for Sundstrand in 1986, 1987, and 1988, respectively. He also spent only *278 a small amount of his time writing and reviewing articles during the years in issue. Consequently, even if we assume petitioner worked only a 5-day week (and we are convinced he worked more than that), we find that he spent more than 80 percent of his time performing qualified services. We also conclude that Mrs. Fudim spent at least 80 percent of her time in 1987 engaged in qualified services. She is a highly trained engineer proficient in computer programming. With this expertise, she had to have been a substantial help to her husband. On the other hand, we simply do not have sufficient information to determine whether Natalia's services were so directed. The record fails to reveal Natalia's age, training, or level of expertise. Petitioner also failed to present any evidence as to what services Natalia rendered. Therefore, we find that petitioner is not entitled to any research credit based on the wages he paid Natalia. On the basis of our findings, petitioner's research credit for 1986, 1987, and 1988, and allowable carrybacks must be recomputed. Accordingly, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioner issued a Form W-2 reporting that Mrs. Fudim was paid wages in 1987 of $ 9,600. She reported these wages on her 1987 joint income tax return.↩
3. Petitioner issued Natalia Forms W-2 reporting these amounts. Petitioners claimed a dependency exemption for Natalia for all years in issue.↩
4. At trial, petitioner produced summaries, but no contemporaneous records, of the time he, Mrs. Fudim and Natalia spent on research and development. He claims he threw the contemporaneous records away after respondent completed the initial audit of his books.↩
1. There is no indication in the record as to why petitioners did not deduct losses on the St. Petersburg Beach condominium for 1988.↩
2. The Madeira Beach condominium expenses add up to $ 964, but petitioners deducted $ 864 on their 1988 income tax return.↩
5. Because the general business tax credit claimed by petitioners during the years in issue was composed solely of the research credit, hereinafter, all references to the credit claimed by petitioners shall be to the research credit.↩
6. Sec. 38(c)(1) provides: The credit allowed * * * shall not exceed the excess (if any) of the taxpayer's net income tax over the greater of -- (A) the tentative minimum tax for the taxable year, or (B) 25 percent of so much of the taxpayer's net regular tax liability as exceeds $ 25,000.
Therefore, although respondent stated that section 38(c)(1)(B) was the basis of her adjustment to petitioners 1988 income tax, it appears that the adjustment was actually computed under section 38(c)(1)(A).↩
7. Petitioners income tax liability for 1985 had been decided by this Court in T.C. Summary Opinion 1988-224, prior to the issuance of the notice of deficiency.↩
8. The notice of deficiency showed that the amounts previously assessed totaled $ 10,861. This amount consisted of the tax reported by petitioners on their 1988 income tax return ($ 7,639) plus the excess research credit disallowed by respondent ($ 3,222).↩
9. Respondent offset $ 1,125 of petitioners' refund, applying $ 317.35 against petitioners liability for 1985 and $ 807.68 against petitioners' liability for 1988. It is not clear how respondent arrived at these balances.↩
10. This case is riddled with administrative procedural problems because respondent was sending petitioners notices from both the Kansas City Service Center (about a mathematical error on their 1988 return) and the District Director in Milwaukee (about deductions claimed on their 1986, 1987, and 1988 income tax returns). Because the notices sent to petitioners from these offices were not coordinated, they appeared to petitioners to contradict one another.↩
11. In addition to detrimental reliance, estoppel claims must include the following elements: (1) the representation must be factual, rather than legal or opinion-based; (2) the party claiming estoppel must be ignorant of the truth; and (3) the reliance must have been reasonable. Kronish v. Commissioner, 90 T.C. 684, 695 n. 10 (1988); Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); Underwood v. Commissioner, 63 T.C. 468, 477-478 (1975), affd. 535 F.2d 309 (5th Cir. 1976); Cavanaugh v. Commissioner, T.C. Memo. 1991-407, affd. without published opinion 986 F.2d 1426↩ (10th Cir. 1993).
12. "Our examiners request an extension period no longer than is necessary to complete the examination and any action necessary to close the case." IRS Publication 1035 (rev. 8-87).↩
13. It is also worth noting that while petitioners might have viewed IRS Publication 1035 as being authoritative, informational tax publications, such as IRS Publication 1035, do not constitute authority. Green v. Commissioner, 59 T.C. 456, 458↩ (1972), and the cases cited therein.
14. Form 870 (Waiver of Restrictions or Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment) contains language that is almost identical to the waiver language above petitioners' signatures on the examining agent's reports.↩
15. Generally, in this Court, the taxpayer bears the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111↩ (1933). Exceptions to this rule are enumerated in Rule 142(b).
16. See Lysek v. Commissioner, T.C. Memo. 1975-293, affd. 583 F.2d 1088↩ (9th Cir. 1978), where we held that a notice of deficiency was not arbitrary when it resulted from the taxpayer's refusal to furnish his books and records on request for second inspection.
17. See H. Rept. 94-658 (1975), 1976-3 (Vol. 2) C.B. 695, 856; S. Rept. 94-938 (1976), 1976-3 (Vol. 3) C.B. 49, 189-190↩.